Fred GROOMS, Appellant,

v.

COMMONWEALTH of
Kentucky, Appellee.

No. 85–SC–418–MR.

Supreme Court of Kentucky.

June 9, 1988.

As Modified on Denial of Rehearing
Sept. 8, 1988.

Kevin Michael McNally, R. Neal Walker, Assts. Public Advocate, Frankfort, for appellant.

David L. Armstrong, Atty. Gen., C. Lloyd Vest II, Rickie L. Pearson, Assts. Atty. Gen., Frankfort, for appellee.

## OPINION OF THE COURT

The appellant was convicted of the murder of Patricia Ross and was sentenced to death. He was also convicted of the attempted murder of Larry Lehner and sentenced to imprisonment for 20 years. At the time of the commission of these offenses, appellant was an inmate at the Kentucky State Penitentiary at Eddyville, Kentucky. Patricia Ross was an employee at the penitentiary, and Larry Lehner was a fellow inmate. The incident began when the appellant asked Patricia Ross for some supplies from the storeroom and accompanied her into the storeroom to get them. While in the storeroom he struck her with an industrial can opener, knocking her to the floor and causing her death. After this incident, Larry Lehner came into the storeroom, and appellant hit and injured him, knocking him to the floor, but death did not result to him.

The appellant has instituted this appeal from each of the convictions. We affirm in part and reverse in part.

## THE MURDER CONVICTION

■ The appellant filed a motion for a change of venue supported by the affidavits of 13 residents of Lyon County, Kentucky, who expressed the opinion that appellant could not have a fair trial in Lyon County. A hearing was conducted on the motion during which numerous newspaper clippings which had been published near the time of the crime were introduced. A public opinion poll conducted by a clinical psychologist was introduced to show that the percentage of people who had heard about the case; who thought that the defendant was probably guilty; and who, if guilt was actually proven, would favor the death penalty as a punishment, was somewhat higher in Lyon County than in two other neighboring counties. It also showed that the percentage of people who thought that the defendant could obtain a fair trial in their respective counties was higher in the adjoining counties than in Lyon County. The polls showed, however, that a majority of those polled in Lyon County felt that appellant could have a fair trial in Lyon County. The Commonwealth filed the affidavits of two witnesses who stated that in their opinion the appellant could obtain a fair trial in Lyon County.

The trial court denied the motion for change of venue. The question of whether change of venue should be granted is a matter entrusted to the sound discretion of the trial court. *Hurley v. Commonwealth*, Ky., 451 S.W.2d 838 (1970). We have examined the affidavits, the newspaper clippings, and the evidence concerning a public opinion survey offered by the appellant. We find nothing therein to convince us that

the trial judge abused his discretion by denying the motion to change the venue.

█ Before the commencement of the trial, the trial court sustained the appellant's motion for individual examination of prospective jurors outside the presence of the other jurors. In a hearing on the motion, appellant's counsel indicated it would need individual examination outside the hearing of other jurors only as to matters concerning pretrial publicity and on the jurors' views concerning the death penalty.

During the voir dire, the trial court instructed counsel that separate examination of individual jurors would be limited to their opinions as to the death penalty. Counsel then proceeded to inquire of all jurors, who had previously indicated they had some knowledge of the case, what specific knowledge they had, what they had heard about the case, and from whom they had heard it. The court sustained objections to the questions. As a result, counsel for appellant were never permitted to learn what information the prospective jurors had learned about the case.

█ A basic principle of due process is the right to an unbiased decision. In jury trials, one of the purposes of a voir dire examination is to enable the court and counsel to screen from the jury panel those individuals whose verdict might be influenced by prior knowledge of the case. This screening is accomplished through challenges for cause to jurors and also through the exercise of peremptory challenges.

The record here substantiates that there was a great amount of pretrial publicity concerning this case. A public opinion survey showed that 98 percent of the prospective jurors polled were aware of the case. All but four of the 28 jurors questioned on voir dire acknowledged having some information about it. Several of these prospective jurors or members of their family worked at the penitentiary. Some of them had discussed the case with others.

The exclusion of any question as to the extent of the knowledge about the case possessed by the prospective jurors and the inability of counsel to learn what they had

heard about it and from whom they had heard it, kept from the trial judge information important to the determination of whether a challenge for cause to a particular juror should have been sustained and kept from counsel information important to the determination of which jurors should be peremptorily challenged. *See Silverthorne v. United States*, 400 F.2d 627 (9th Cir. 1968); *Stone v. Monticello Construction Company*, 135 Ky. 659, 117 S.W. 369, 371 (1909); *American Bar Association Standards for Criminal Justice, Fair Trial and Free Press*, § 8–3.5.

█ Inquiry in the presence of other jurors as to what a prospective juror has heard about the case poses the danger of bringing that information to the ears of the other prospective jurors. The better procedure is to question jurors separately and out of the presence of each other on such matters. Such a request was made by counsel for appellant and was denied.

█ We do not hold that counsel for appellant had any absolute right to question prospective jurors on these matters because the extent of direct questioning by counsel during voir dire is a matter within the discretion of the trial court. If the trial judge conducts the voir dire, on request by appellant's counsel, inquiry should be made into the extent of the knowledge possessed by prospective jurors about the case and the source of that knowledge.

█ Appellant contends that he was prejudiced because he was forced to use peremptory challenges upon jurors who should have been excused for cause and that he was further prejudiced because three jurors who should have been excused for cause actually sat on the jury. Those three were allowed to remain on the jury because appellant had used all of his peremptory challenges and was unable to excuse them.

█ The question of whether a juror should be excused for cause is a matter within the discretion of the trial court. If the trial judge abuses his discretion by denying a challenge for cause, we have held it reversible error in a case where the

defendant has elected to use a peremptory challenge to excuse that juror and it later develops that the defendant is prevented thereby from exercising a peremptory challenge to another juror whom he desired to challenge. *Marsh v. Commonwealth*, Ky., 743 S.W.2d 830 (1988); *Rigsby v. Commonwealth*, Ky., 495 S.W.2d 795 (1973). This is true because a defendant should not be required to waste his peremptory challenges on jurors who should have been excused for cause.

The appellant challenged Juror Veech for cause. The challenge was denied, and appellant exercised a peremptory challenge upon him. There were other jurors as to whom his challenges for cause were denied and who actually sat upon the jury because he had exhausted his peremptory challenges. It is apparent he would have exercised a peremptory upon at least one of them if he had not been forced to use his last peremptory upon Juror Veech.

In pretrial examination Juror Veech testified as follows:

"Mr. McNally: Mr. Veech, I think it is my turn. I need to ask you in a little bit of privacy about two subjects. The first is, why don't you tell the judge and the rest of us here what you think about the death penalty.

"Mr. Veech: I think there should be a death penalty.

"Mr. McNally: Good. Can you tell me why?

"Mr. Veech: Well, I figure that when somebody takes somebody's life like that, that they should pay for it.

"Mr. McNally: Do you feel strongly about that?

"Mr. Veech: Yes.

"Mr. McNally: Do you feel that this country should use it more often?

"Mr. Veech: Yes, I do.

"Mr. McNally: Do you feel that is true, that somebody intentionally, and I am not talking about self-defense or something where there is a fight, but intentional murders, do you feel that the death penalty is

an appropriate punishment for taking another life intentionally?

"Mr. Veech: Yes, I do.

"Mr. McNally: Let me explain to you the statute a little more than we did yesterday and Bill will correct me if I misstate it. Somebody is killed. Somebody is accused of murder and there is a trial. The jury comes back and convicts them of intentional murder, all right, not manslaughter or something else. Sometimes in those intentional murders, the Legislature says, can be death penalty possibilities. A couple of examples would be murder during an armed robbery or during a rape. One of those statutory things is the intentional killing of a correctional officer in the course of his duties. That is why we are asking these questions. If this jury should convict Fred of the intention (sic) murder of a correctional officer in the course of his duties, then there is a second side of the trial, and there can be evidence presented by either side. The jury then has a lot of choices. They can go 20 years, they can go all of the way to the death penalty. They have a lot of freedome (sic), okay? What I am hearing you say is that your choice is going to be the death penalty because of the way that you feel. Is that what you are saying?

"Mr. Veech: I feel that, if somebody takes somebody's life and it is not self-defense, I think they should be done away with. I can't help it, but I feel that way.

"Mr. McNally: You don't have to apologize for it. You are an honest man. Do you feel that strongly?

"Mr. Veech: Yes.

"Mr. McNally: All right, thank you.

"Mr. Cunningham: Let me correct the record. One matter that Mr. McNally stated, inadvertently, I am sure, the aggravating circumstance which might make this case a capital offense is the killing of a correctional employee. She wouldn't necessarily have to be a correctional officer. That may or may not make a difference, but I wanted to correct that. From Mr. McNally's questioning, there is no question where you stand as far as your belief in the death penalty. I just want to ask a few

questions to follow up on that. He did a good job of telling you, I believe, what the range of penalties are. In this case, if you were to find the defendant Fred Grooms guilty of murder, then you will come back in this courtroom and only then would you then start considering, after hearing other evidence, at least, there will be a second deliberation on the sentencing phase. Could you consider, if the jury found the defendant guilty of murder, could you consider a lesser penalty than the death penalty?

"Mr. Veech: It would have to be awful good circumstances, like, if it wasn't intentional.

"Mr. Cunningham: Of course, murder, by definition is an intentional killing, right. I think we all probably know that. The court will instruct you in the second stage of the proceeding that now it is your duty to set a penalty in this case and you are permitted to set the penalty at anywhere from 20 years up to life and up to the death penalty. Would you consider other penalties other than the death penalty?

"Mr. Veech: I am not sure. I am just really—

"Mr. Cunningham: All right, assuming there was no evidence put on the second stage, just assuming for the sake of argument, by anybody, and all you had was that you convicted Fred Grooms of killing a correctional employee in the course of her duties, and the court gave you this range of penalties. Would you automatically vote for the death penalty, or would you consider a lesser punishment?

"Mr. Veech: If there wasn't no evidence to show—I didn't understand the first part.

"Mr. Cunningham: Let's assume—what I am getting at, say that you had already been out and voted in this case and you voted to convict the defendant of murder for the killing of Patricia Ross, a prison employee. Would you consider other penalties other than the death penalty?

"Mr. Veech: I think after I made up my mind, I wouldn't change it. Like, if I said that somebody should, I wouldn't change my mind.

"Mr. Cunningham: But, I am saying that you had made up your mind about the guilt.

"Mr. Veech: Right.

"Mr. Cunningham: But, do you know that in this proceeding, you have to make two determinations. Before you ever get to the sentencing stage, you have to make the guilt determination, right? After you make the guilt determination, you then go to the sentencing stage and the judge is going to give you a range of penalties. Could you consider other than, such as the emotional state of the defendant, or anything else that might be brought in here, which would mitigate that crime to the point that you didn't feel like you should vote for the death penalty, that you could vote for something lesser as far down as 20 years?

"Mr. Veech: If there was something else to make me change my mind, I might. That's right, I might do it.

"Mr. Cunningham: You might not vote for the death penalty?

"Mr. Veech: That's right, I might not, if they could prove that something might be that it wasn't right.

"Mr. Cunningham: I don't want to put words in your mouth, but are you telling me that you might be willing, or would be willing to consider other circumstances and consider a lesser penalty than the death penalty?

"Mr. Veech: Yes.

"Mr. Cunningham: You are positive about that?

"Mr. Veech: Well, I am stronger the other way, but I might be able to consider it.

"Mr. Cunningham: I understand that, I understand that.

"Mr. Veech: I just feel stronger the other way.

"Mr. McNally: I appreciate your honesty about this.

"Mr. Veech: That is just the way that I feel.

"Mr. McNally: Yeah, and the way that you feel—

"Mr. Veech: And I am going to say the way that I feel. I just can't do it any other way.

"Mr. McNally: And you are right, too. You have a right to feel that way. My question to you is—I will try to make this as simple as I can. If you and the other eleven find him guilty of intentional murder, okay, not that he is insane or anything, but intentional murder of Pat Ross who is a correctional employee and was in the course of her duties, is there anything that could cause you to vote for a 20 year sentence for that crime, feeling the way that you honestly feel about the death penalty?

"Mr. Veech: Not if it was intentional, I wouldn't.

"Mr. McNally: I didn't think so. Thank you very much.

"Mr. Cunningham: I have not (sic) further questions.

"The Court: Let me ask you something. I appreciate your candor, and really think that you are going to be as honest and candid as you know how. Mr. Veech, in this case, the first thing that is going to happen is, if you are selected to sit on this jury, the jury is going to determine whether or not the defendant is guilty beyond a reasonable doubt of the crime for which he is charged. The jury will go out and deliberate and come back in. Of course, if the jury finds him not guilty, that is the end of it. But, if the jury finds him guilty of the crime with which he is charged, which is murder, then there will be a sentencing stage to this trial. The defendant can introduce evidence that he was acting under what used to be called 'sudden heat and passion', that he has no significant of (sic) prior offense, various mitigating things, the jury will listen to all of that. Then the Commonwealth will also produce aggravating circumstances if he decides to do that. Then the case will be resubmitted to the jury and the punishment will be from 20 years on up to life or death. What I want to know is, when you go back in that second phase, if you can consider the whole range of punishment for 20 years all of the way up to death in your deliberation?

"Mr. Veech: Yes, I would consider all of it.

"The Court: If you feel that there were mitigating circumstances, even if he was guilty of murder, but you felt like there was some mitigating circumstance that would mitigate this crime, would you or would you not automatically then consider the death penalty?

"Mr. Veech: I didn't understand the last of what you said.

"The Court. Well, let me put it this way: If you felt some compassion for the defendant, even though you had found him guilty of murder, if you feel some compassion for him, you would not automatically, or would you, automatically consider the death penalty?

"Mr. Veech: What do you mean by compassion?

"The Court: I mean if you felt sorry for him.

"Mr. Veech: That wouldn't have nothing to do with it."

■ It has long been the law in capital cases that the Commonwealth is entitled to have excused for cause a person who has such conscientious objection to the death penalty that he would never, in any case, no matter how aggravated the circumstance, vote to impose the death penalty. *Witherspoon v. United States*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

■ Conversely, a juror should be excused for cause if he would be unable in any case, no matter how extentuating the circumstances may be, to consider the imposition of the minimum penalty prescribed by law. The testimony of Juror Veech makes it abundantly clear that he favors the death penalty to the exclusion of all other penalties as punishment for intentional murder. Mitigating circumstances or compassion would have nothing to do with it.

■ Some persons are strongly in favor of the death penalty, while others have a

strong aversion to it. It is not that a juror favors the use of the death penalty or disfavors it that will disqualify him as a juror. It is only that when a juror feels so strongly against the death penalty that he could never, in any circumstance, vote to impose it, or feels so strongly in favor of the death penalty for murder that upon a determination of guilt he could never, in any circumstance, vote to impose a lesser penalty than death, that he is disqualified as a juror.

For all practical purposes, the issue for the jury in this case was not the question of whether the appellant caused the death of the victim, but rather what penalty should be imposed. Testimony for the prosecution and the defense presented various factors which might have prompted the killing. The Commonwealth pictured the appellant as a person who deliberately murdered the victim in a prison storeroom upon a pretext which seemed legitimate but with the actual intent to commit rape, and who, when frustrated, killed the victim and attempted to kill another person present at the scene of the attack.

The appellant introduced evidence that he and the deceased worked together in harmony, that fellow convicts teased him that the victim was his girlfriend or that she had a crush on him. They later started teasing him that she was having a relationship with another man. The defense theory was that the appellant, somewhat mentally retarded, fantasized about a relationship with the victim and was taunted into an uncontrollable rage, that he never intended to kill the victim, and that afterwards he stated he didn't know why he did so.

Our statute recognizes that inmates constitute a danger to prison employees. It authorizes the death penalty for a murder committed by an inmate upon a prison employee engaged in the performance of his duties. K.R.S. 532.025(2)(a)(5). This was such a homicide, tried in the county where the prison is located, where many of the prospective jurors had some knowledge of the case, and when a substantial number of them worked at the penitentiary or had relatives or friends who worked there. In a capital case such as this where the theories underlying the crime presented by the Commonwealth and the appellant are so at variance, it is especially important that the jury not be composed of people unwilling to consider the entire range of punishment in the event of a guilty verdict.

It is our view that the trial court abused its discretion in denying the appellant's challenge for cause to Juror Veech. As a result, the appellant was denied the right to peremptorily excuse another juror who he had attempted to excuse for cause but who sat on the panel because appellant had no further peremptories to exercise.

Appellant contends the court erred in refusing to have him transported to Louisville, Kentucky, for examination as to whether he was suffering from a mental disease or defect and whether he was competent to stand trial. Shortly after appellant's arraignment, the Commonwealth moved that appellant be subjected to such examinations, and the appellant objected. He maintained then that he had not served notice of insanity as a defense nor raised any question concerning his competence to stand trial. The Commonwealth's motion was denied.

Because our disposition of this case will necessitate a new trial, the matter of the necessity of a mental examination, if raised by either party, can be considered anew at that time.

Immediately following the discovery of the death of Patricia Ross, prison officials gathered some physical evidence from the scene. A pair of pants, a towel, and a cloth, all alleged to have blood stains upon them, were turned over to a state crime laboratory for analysis. Other physical evidence, including the murder weapon, was not tested for blood, hair, or fingerprints. The appellant moved for production for inspection of physical evidence, including blood and clothing, on March 26, 1984. A hearing on the motion was heard on April 6, 1984, and the motion was sustained on that date. Blood samples examined by the state laboratory were routinely destroyed on April 16, 1984, in accord with

established practices. Because of lack of refrigeration which causes blood enzymes to deteriorate, the appellant was unable to have blood tests performed on the pants, the towel, the cloth, and the murder weapon.

Appellant contends that all evidence of the laboratory tests upon these items should have been suppressed because the state destroyed the blood samples and by its failure to preserve other items for testing, which effectively denied him the right to obtain evidence which may have been favorable to him.

The routine destruction of blood samples after testing does not automatically render inadmissible testimony concerning laboratory tests which were performed upon the samples. In *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), the United States Supreme Court was faced with the issue of the admissibility of the results of breathalizer tests upon breath samples which were not retained for independent testing by the defendant. The Court stated:

"Given our precedents in this area, we cannot agree with the California Court of Appeal that the State's failure to retain breath samples for respondents constitutes a violation of the Federal Constitution. To begin with, California authorities in this case did not destroy respondents' breath samples in a calculated effort to circumvent the disclosure requirements established by Brady v Maryland and its progeny. In failing to preserve breath samples for respondents, the officers here were acting 'in good faith and in accord with their normal practice.' *Killian v United States*, supra, [368 U.S. 231] at 242, 7 L Ed 2d 256, 82 S Ct 302 [at 308 (1961)]. The record contains no allegation of official animus towards respondents or of a conscious effort to suppress exculpatory evidence.

"More importantly, California's policy of not preserving breath samples is without constitutional defect. Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense."
*California v. Trombetta*, 467 U.S. at 479, 104 S.Ct. at 2529, 81 L.Ed.2d at 421–422.

In the instant case, the destruction of the blood samples at the laboratory followed a routine practice and there is no indication it was done in a calculated effort to circumvent disclosure requirements. Additionally, it is noted that the appellant had confessed to the crime, and the Commonwealth had no reason to expect that the blood samples or blood enzymes would in any way exculpate him. We find no error in the failure of the Commonwealth to preserve this evidence.

Appellant contends that prison regulations which prohibited prison employees from revealing information of a personal nature concerning inmates or staff members prevented him from preparing a defense because many employees felt they would lose their jobs if they talked to defense counsel about the case.

On December 20, 1984, a hearing was held to address this communication problem. At the hearing it was agreed that the trial judge would issue an order that would direct the prison warden to inform prison employees that they would not suffer any reprisal for talking to either the prosecution or the defense counsel. Defense counsel agreed to prepare the order. On the first day of the trial appellant's counsel sought a continuance and stated that he had prepared such an order but that, "It is apparently too late for any remedial action." The court denied the continuance, but in view of our reversal of the judgment on other grounds, this particular matter should not pose any difficulty at a retrial.

Appellant contends that although he tendered an instruction that the jury should not draw any inference from his failure to testify, no such instruction was given. Such an instruction is required upon proper request by a defendant. *Carter v. Kentucky*, 450 U.S. 288, 101 S.Ct. 1112, 67 L.Ed.2d 241 (1981). For purposes of a retrial, we point out that the mere tendering of an instruction does not satisfy the requirement of a proper request under

our rules of procedure. To preserve any error relating to the failure to give an instruction, there must be an objection in the record stating specifically the matter to which the party objects and the ground therefore. RCr 9.54(2). In many cases, as in this one, counsel submit a raft of tendered instructions, any one of which may be overlooked by the trial court. The failure to instruct upon a matter which would have been surely instructed upon if the oversight had been called to the attention of the court by counsel is not error. On retrial counsel can protect the record on the failure to give this instruction, if it is not given, by specific objection to the instructions for that reason.

 The Commonwealth introduced a tape recorded confession given by the appellant. Appellant contends that this confession should have been suppressed because, (1) he was led to believe the maximum penalty would be life imprisonment if he confessed; (2) he was told he could only have the services of an attorney if he went to court; (3) the waiver of his rights was not voluntary because of his low I.Q. and the circumstances of the questioning; (4) his conviction was the "fruit of a poisonous tree" because it was obtained following an earlier confession in violation of his *Miranda* rights; and (5) the trial judge refused to consider polygraph evidence.

The appellant was not told that his maximum sentence would be life imprisonment if he confessed. He asked the investigating officer if this was a death penalty case and was told that the penalty for murder was 20 years to life imprisonment and that the death penalty was possible if another person injured by him, who was then in the hospital, should die. He was thus apprised, before making any confession, that the death penalty was a possible sentence for his crime. In any event, a statement otherwise voluntary is not rendered involuntary merely because the declarant did not understand the full range of the consequences of his statement. *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed. 2d 222 (1985).

We do not find in the record any testimony that appellant was told that, as an indigent, a lawyer would be appointed for him only if he went to court. The testimony of Detective Potter concerning his warning to appellant was as follows:

"He had a right to an attorney, if he would (sic) not afford one the Court would appoint one for him. He had a right to have an attorney present during any questioning, if he give (sic) up that right he could stop the questioning at anytime refusing to answer further and requesting to have an attorney present.... If he did agree to talk to us without an attorney if any of us asked him a question he didn't want to answer he could say I don't want to answer that question or I want to have an attorney present."

 The trial court did not err by excluding the results of a polygraph examination and the court's finding that the confession was voluntarily given after a waiver of *Miranda* rights is supported by the evidence.

 The appellant further contends that before he gave the tape recorded confession he had been subjected to an earlier custodial interrogation at the prison without benefit of *Miranda* warnings, and as a result thereof, he had confessed to the crime. He claims that any subsequent confession was a "fruit of a poisonous tree" and therefore should be suppressed.

Shortly after the crime was discovered, some 18 inmates who could have had some knowledge pertaining to the crime were questioned, without *Miranda* warnings, in a general way concerning any pertinent information they might have. Appellant was one of those questioned. The officers claim that he was not a suspect at that time.

Appellant was questioned concerning the exact whereabouts of certain other inmates at or near the crime scene, and his answers were conflicting. He suddenly blurted out that he was the one who committed the crime. He was then taken before the chief investigator, given his *Miranda* warnings, and he made the tape recorded confession.

The trial judge determined that no *Miranda* warnings were necessary at the time of the first inquiry because the investigation then was only of a general nature and had not focused upon the appellant as a suspect. This ruling appears to be fully supported by the evidence. In any event, this first confession was not placed before the jury. The only confession heard by the jury was tape recorded, and the evidence is that the appellant was informed of his *Miranda* rights and that he voluntarily agreed to make the statement.

■ When a defendant is aware of his *Miranda* rights and understands them, and thereafter agrees to make a statement, that statement is admissible in evidence even though he had previously made a similar statement without benefit of the *Miranda* warnings; the "fruit of a poisonous tree" doctrine is not applicable. *Oregon v. Elstad, supra.*

Appellant contends there were numerous errors in the instructions. Because this case is likely to be retried, we will discuss some of these claims of error for the guidance of the trial court.

In an opening statement to the jury appellant's counsel stated:

"We do not intend to dispute that Fred Grooms took Pat Ross' life; nor do we intend to dispute that he did so intentionally. Our proof, ladies and gentlemen, in this case, will center around some words that you heard during jury selection— Fred's mental state whether, at the time he took Pat Ross' life, he was acting under the influence of an extreme emotional disturbance for which there was a reasonable justification or excuse under the circumstances as Fred Grooms believed them to be."

■ As a trial tactic counsel conceded that the homicide was intentional, and there is no merit to the contention now made that the court should have defined the word "intentional" and should have instructed on wanton homicide, second degree manslaughter, or reckless homicide. Since the trial of this case, this court has formulated a definition of the phrase "extreme emotional disturbance," in *McClel-*

*lan v. Commonwealth,* Ky., 715 S.W.2d 464 (1986). At the time of this trial, there was no requirement to define the term, but upon retrial the phrase, "extreme emotional disturbance" should be defined in the instructions as set forth in *McClellan, supra.*

■ The court instructed on reasonable doubt as to the degree of offense as follows:

"If upon the whole case you have a reasonable doubt that he is guilty but have a reasonable doubt as to the degree of the offense of which he is guilty, you shall find him guilty of the lower degree."

This instruction was erroneous in that it tells the jury that if it has a reasonable doubt as to appellant's guilt it may nevertheless find him guilty. The instruction should have told the jury that if it had no reasonable doubt that he was guilty of some offense, but had a reasonable doubt as to the degree of the offense of which he is guilty, it should find him guilty of the lower degree.

■ Appellant alleges error in that the jury instruction in the penalty phase lessens the jurors' ultimate responsibility for the fate of the appellant by over emphasis of the word recommend rather than placing upon the jury the onus of fixing punishment.

We have held that jurors should not have a lessened responsibility in determining the punishment in death penalty cases. In this case the appellant was tried for two offenses, only one of which was a capital offense. In the noncapital case the jury was directed to fix the punishment. In the capital case the jury was required to recommend a punishment.

We think any reasonable juror would readily perceive a difference in his ultimate responsibility when he must fix a punishment or when he must only make a recommendation to someone else whose responsibility it is to fix the punishment. Under the circumstances of this case, if the appellant is found guilty on retrial, the instruc-

tions on the penalty phase should require the jury to fix the punishment. As a matter of law, the punishment fixed by the jury shall be considered to be a recommendation by the jury to the trial judge, who will then have the ultimate responsibility of fixing the penalty as prescribed by statute.

■ During the deliberations of the jury it was reported to the trial court that one or more jurors were seen taking Bibles with them into the jury room. The appellant moved for mistrial on this ground, and the motion was denied. In view of our decision in this case, it is unnecessary for us to determine whether this matter, standing alone, would have necessitated a reversal, but on retrial the court is instructed that jurors should not be allowed to take Bibles into the jury room with them.

We have reviewed all of the errors alleged by the appellant, and those not discussed in this opinion we have found to be without merit or not likely to occur upon a new trial.

### THE ATTEMPTED MURDER CONVICTION

We have carefully considered appellant's allegations of error, and we find no error in the proceedings on Count 2 of the indictment of the appellant's conviction of attempted murder.

The judgment of conviction of the appellant for murder and his sentence to death is reversed for a new trial consistent with this opinion. The judgment of conviction of the appellant for attempted murder on Count 2 of the indictment is affirmed.

GANT and VANCE, JJ., concur.

STEPHENS, C.J., concurs in part and dissents in part by separate opinion in which LEIBSON, J., joins.

WINTERSHEIMER, J., concurs in part and dissents in part by separate opinion in which STEPHENSON, J., joins.

LAMBERT, J., concurs with the opinion of the court except that portion which relates to the trial court's ruling on the motion for change of venue. On the venue issue, he concurs with the views expressed by STEPHENS, C.J., and would direct the trial court to grant the motion. As such, LAMBERT, J., would reverse both convictions.

STEPHENS, Chief Justice, concurring and dissenting.

I certainly concur with the majority's result, in reversing the appellant's murder conviction, and I also concur with most of the admonitions and directions suggested by the majority in the event of a retrial. However, what disturbs me about the majority opinion is that it fails to acknowledge what is, in my opinion, an obvious fact; *viz.*, that the appellant (although clearly guilty of the homicide) did not receive a fair trial.

It is beyond cavil that *every defendant*, no matter how heinous the crime, must receive the protections afforded him or her by the United States Constitution, the Kentucky Constitution, the Kentucky statutes, the rules of this Court and the precedents of this Court and the rules and precedents of the United States Supreme Court which interpret these basic rights. *All judges* have taken a solemn oath to preserve and protect those rights, in spite of the nature of the crime, the status of the victim or the pressures of an outraged community.

These principles of justice are easy to state: they are not always easy to apply. For this reason, appellate judges are thus properly isolated from the local situation and its concomitant pressures. It is the obligation of an appellate court to guarantee fairness and objectivity in all cases, no matter how unpleasant it may be. It is in this spirit that I concur, but respectfully suggest that Fred Grooms did not get a fair trial, and that at retrial, certain changes must be made.

### SHOULD A CHANGE OF VENUE HAVE BEEN GRANTED?

I fully acknowledge that wide discretion is (as it should be) given to the trial court in determining this question. *Hurley v.*

*Commonwealth*, Ky., 451 S.W.2d 838 (1970). The question we determine as appellate judges, is whether the trial court abused his discretion in denying a change of venue. I believe it is clear that the trial judge did so in this case.

At the hearing to determine this question, it was clearly established that the crimes were extremely well publicized by all of the local and regional media. It literally was the "talk of the town". In a somewhat unusual move, appellant introduced a public opinion survey, prepared by a psychologist who testified as to its contents. It showed that 98% of the people in Lyon County knew about the homicide; that 55% of the residents of Lyon County believed appellant to be guilty; that 58% of Lyon Countians preferred the death penalty; and that *only* 54% of Lyon Countians believed Grooms could get a fair trial in their county. In addition, 13 affidavits of Lyon County citizens were filed which indicated that appellant could not receive a fair trial in Lyon County. The *only* response by the Commonwealth was the filing of two affidavits to the effect that appellant could indeed receive a fair trial in that venue.

The majority opinion disposes of the poll by stating that a majority of Lyon Countians believed Grooms could receive a fair trial. That "majority" is the 54% referred to above. The fact that only 54% of the citizens believed appellant could get a fair trial in Lyon County is, in my opinion, *by itself*, sufficient to show that Grooms could not get a fair trial there. These statistics mean that 46% of the people felt that he could *not* get a fair trial. To permit a trial in such a location is similar to playing Russian roulette with 46% of the gun's chamber being loaded. Is that a fair trial? Is that due process of law? Any *substantial* community feeling against the accused should militate that a change of venue should be granted. Here, 98% of the people knew of the crime; 55% of the people thought Grooms to be guilty and 58% preferred the death penalty.

I believe the evidence is overwhelming that the trial court abused its discretion, and I would accordingly reverse on this ground and direct that any retrial be conducted in a venue where a fair trial can occur. *See Ice v. Commonwealth*, Ky., 667 S.W.2d 671 (1984).

## DID THE TRIAL COURT ERR IN LIMITING INDIVIDUAL VOIR DIRE EXAMINATION TO THEIR OPINIONS AS TO THE DEATH PENALTY?

As the majority opinion states, counsel for appellant was *never* permitted to learn what information or prior knowledge prospective jurors had about the case. The majority states "the better procedure is to question jurors separately and out of the presence of each other on such matters". This procedure was denied by the trial court. Why? It would have only taken a little more time, and when an accused's life is at stake, that time is a small price to pay. I cannot argue that the majority is legally incorrect when it says that the matter is within the sound discretion of the trial judge. But, I believe that, on retrial, the trial court should be directed to permit individual, separate examination. Ultimate fairness in this case requires it.

## WAS THE JUROR SELECTION CORRECT?

Under the majority opinion, this case is reversed because of the improper selection of *one* juror—Mr. Veech. The majority is absolutely correct in its analysis of that issue. I part company with the majority because numerous other jurors were approved who *clearly should not have been*. In addition, I find several other questionable practices in the overall selection of the jury panel. One is, as indicated above, the failure to allow *any* individual inquiries as to the veniremen's knowledge of the case.

Appellant was unable to remove for cause, but was forced to exercise peremptory challenges, to eight persons who had a close relationship with the victim's family or with Kentucky State Prison employees. Since appellant was confined at the state prison, and the victim was a well-known, loved and valued employee of the prison, it

was clearly error not to remove these persons for cause.

The majority correctly states the law, when it held that whenever a trial court abuses its discretion in denying a challenge for cause, it is reversible error where the defendant exhausts all his peremptory challenges after electing to use a peremptory challenge to excuse the jurors.

I will not belabor this opinion with an extensive discussion of each of the eight disputed challenges. A summary will suffice to show that the trial court seemed almost oblivious of his duty to see that a fair and impartial jury should be selected in this case.

Mr. Henderson was a brother to one Kentucky State Penitentiary employee, and a brother-in-law to another. He conceded that he "had some thoughts" on what should be "done" to the person who killed the victim. Moreover, his stepfather (a former guard at Kentucky State Penitentiary) was held hostage by a prisoner and his grandfather was knifed by an inmate. He also stated that he did not like the fact that Grooms (a black man) had developed a "crush" on the white female victim.

Ms. Baker reluctantly admitted not only that she knew the victim, but in fact, she had been a student of hers.

John Choat's mother was a fellow employee of the victim at the prison.

Mr. Patton's wife is the secretary of the warden of the prison. Furthermore, he had previously sat on a jury which convicted another defendant of murder.

Mr. Trimm had served as a juror within the past year and implied he had "feelings" about the case.

Ms. Buchanan's husband was superintendent at the Lyon County schools. She knew the victims son and had "sympathy" for him. She also did not approve of the appellant's "affection" for the victim for racial reasons.

Mr. Mayes knew people who worked at the prison, and more importantly, said he "would wonder" why a defendant didn't testify on his own behalf.

Mr. Veech was the other questioned juror, and he stated that he would automatically vote for the death penalty if he found appellant guilty.

Taken individually, I cannot say that the trial court clearly abused its discretion. However, the overall conclusion that I have reached is that not excusing the jurors for cause is part of a cumulative set of circumstances which made it impossible for the defendant to receive a fair trial. "It is the probability of bias or prejudice that is determinative in ruling on a challenge for cause." *Pennington v. Commonwealth,* Ky., 316 S.W.2d 221, 224 (1958).

Moreover, I believe that the trial court erred in excusing *41* jurors, without notice. Nearly *half* of the panel was not available for this trial. According to the trial judge's own notes, eleven percent of those excused by the trial court were excused without good cause. KRS 29A.070.

The picture one gets from a study of the entire record with respect to jury selection is that there is a fundamental lack of fairness in the selection process. Standing alone, one could argue that, technically speaking, there was not a "clear abuse of discretion." However, when an accused's life is at stake, a special effort to insure a fair trial should be made. Because of my belief that the entire process of jury selection was unfair, I would also reverse on this ground.

SHOULD THE APPELLANT HAVE BEEN TRANSPORTED TO LOUISVILLE FOR MENTAL EXAMINATION?

The majority simply states that, in a new trial, the matter of the necessity of mental examination "can be considered anew at that time." I concur, as far as this statement goes. However, I would *direct* the trial court to order the transporting of the defendant to a proper facility for a mental examination, if such is requested by either party.

WAS IT ERROR FOR ONE OR MORE JURORS TO TAKE THE BIBLE INTO THE JURY ROOM DURING THE PENALTY PHASE OF THE TRIAL?

It is not denied that one or two of the jurors had a Bible with them at the penalty

phase of the trial. The bailiff informed the trial court, who in turn informed the prosecutor, but not defense counsel. The prosecutor later informed defense counsel who then made a motion for a mistrial. No admonition was given to the jury and the motion for mistrial was denied.

Defense counsel interviewed a juror and filed an affidavit, part of which is as follows:

> I was advised that a particular passage [from the Bible which "was taken to the jury room"] played a major role in deliberation and, in the opinion of the juror, in the sentence of death which the jury recommended. I was referred to the Book of Numbers, Chapter 35, Verse 16 which the juror read as follows: *"And if he smites [sic] him with an instrument of iron, so that he dies [sic], he is a murderer: the murderer shall surely be put to death."* I suggested to him that the verse sounded familiar, meaning familiar to the facts in Grooms. He answered that more than one juror referred to the verse as the 'word of God' in regard to the issue of penalty that was the subject of their deliberation [TR 1404; AI 160].

It cannot be doubted that this passage had a heavy effect on the jury's ultimate decision to impose the death penalty.

It is clear that error—highly prejudicial error, occurred here. No extraneous matter is permitted in the jury room. *Remmer v. United States*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954). A dictionary is not permitted when its presence in the jury room prejudices the defendant. *Cole v. Commonwealth*, Ky., 553 S.W.2d 468, 471 (1977). Nor may a jurors notes (taken at trial) be taken in the jury room. *Harper v. Commonwealth*, Ky., 694 S.W.2d 665, 669–70 (1985).

What the Bible says about the appropriateness of a death penalty in a particular case is not a legitimate concern of a penalty phase jury. "The law specifies when the death penalty is appropriate, and neither the prosecutor nor the defense counsel should be permitted to adduce evidence as to how [a capital] case should be decided on religious grounds." *Ice v. Commonwealth*, Ky., 667 S.W.2d 671, 676 (1984). If evidence of biblical references to capital punishment is not competent during the penalty phase of a capital trial, it is axiomatic that a jury may not independently consult the biblical scriptures for guidance in reaching its life and death decision.

The prosecutor and judge both admit that at least one juror brought a Bible into the jury room during the penalty phase of Grooms' trial, thus consulting what he or she believed to be a religious authority when making the life or death decision. "The misconduct is obvious." *NeCamp v. Commonwealth*, Ky., 225 S.W.2d 109, 112 (1949). Even more alarming are the references in the uncontested affidavit filed in support of Grooms' motion for a new trial. Not only does the affidavit confirm the existence and use of a Bible during the deliberations, it also establishes that a particular passage from the Book of Numbers, calling for murderers to "be put to death", played a "major role" in the jury's decision that Fred Grooms should be executed.

I have dwelled on this particular issue because of the trial courts failure to do *anything*—either grant a mistrial on the penalty issue or give an appropriate admonition to the jury. I also believe it should have been discussed and used as an additional ground for reversal in the majority opinion.

### SHOULD THE ATTEMPTED MURDER CONVICTION HAVE BEEN REVERSED?

I believe so. Since many of the errors occurred in the guilt phase, logic would require that the error applied to all counts of the indictment. Both convictions were rendered by the same jury. I therefore dissent on that part of the opinion which *affirms* the convictions of attempted murder.

LEIBSON, J., joins in this opinion.

WINTERSHEIMER, Justice, dissenting in part, concurring in part.

I respectfully dissent from that part of the majority opinion which reverses the

judgment of conviction because of the denial of a challenge for cause against a single juror.

It was not reversible error for the trial judge to refuse to excuse prospective juror Veech for cause because of his views on capital punishment as expressed in the pretrial examination. His candid statements would not have prevented or substantially impaired his performance as a juror in accordance with his oath. The trial judge did not abuse his discretion.

The juror did not serve, but Grooms argues that he was required to exercise a peremptory challenge against juror Veech when the court did not excuse him for cause.

· The standard to determine whether a prospective juror should be excluded because of personal views on capital punishment is whether such views would prevent or impair the performance of the juror's duties in accordance with his instructions and oath. *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844 at 852, 83 L.Ed.2d 841 (1985). *Witt, supra,* clarifies the holding of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). The determination of whether a juror should serve or not must be left to the sound discretion of the trial judge. It cannot be reduced to a question and answer session such as the majority recites here at great length.

Bias, whether for the death penalty or against it, remains an unacceptable position for a prospective juror to possess. It is the primary responsibility of the trial judge to make such a decision. A reviewing court should be extremely cautious in substituting its evaluation of the juror for that of the trial judge. Jurors cannot be expected to invariably express themselves carefully or even consistently. Every trial judge understands this, and under our system, it is that judge who is best situated to determine the ability *to serve impartially. Patton v. Yount*, 467 U.S. 1025 at 1039, 104 S.Ct. 2885 at 2893, 81 L.Ed.2d 847 (1984).

Juror Veech, when asked about the death penalty responded by indicating that there should be one and he felt strongly about it.

However, when asked if he would consider a lesser penalty, he responded that he would. When the trial judge questioned the juror and explained each stage of the criminal trial, including the potential sentence that could be imposed, the juror indicated that he would consider "all of it."

In view of the fact that the majority intends to reverse this case for a new trial, it is my advisory opinion that the infinitely better practice would be to permit unlimited peremptory challenges to avoid the situation that has arisen in this case. Here there was no abuse of discretion by the trial judge in my view.

Under all the circumstances, Grooms received a fundamentally fair trial. I would affirm both convictions.

STEPHENSON, J., joins in my dissent.