Robert Keith WOODALL, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 1998–SC–0755–MR.

Supreme Court of Kentucky.

Aug. 23, 2001.

As Amended Jan. 15, 2002.

Rehearing Denied Jan. 17, 2002.

**114**

Thomas Ransdell, Assistant Public Advocate, Randall L. Wheeler, Assistant Public Advocate, Dept. of Public Advocacy, Frankfort, for appellant.

Albert B. Chandler III, Attorney General, N. Susan Roncarti, Assistant Attorney General, Gilbert Busby, Assistant Attorney General, Criminal Appellate Division, Frankfort, for appellee.

WINTERSHEIMER, Justice.

Robert Keith Woodall appeals from a sentence of death for murder and life imprisonment for the rape and kidnapping of Sarah Hansen. Woodall entered a plea of guilty to capital murder, capital kidnapping, and first-degree rape. A jury sentencing trial was conducted July 14 through July 20, 1998. The prosecution called eleven witnesses, and the defense presented fourteen witnesses in mitigation of the crimes. Woodall did not testify at the penalty proceedings. The jury fixed a sentence of death for the capital murder and a sentence of two concurrent life terms for the kidnapping and rape.

The victim was a 16–year–old high school cheerleader, an honor student, a musician, a member of the National Honor Society and the Beta Club and a medalist in swimming and diving. On January 25, 1997, she had planned to watch a video with her boyfriend. She went to the local mini-mart to rent a movie, leaving her home between 7:30 p.m. and 8:00 p.m., never to be seen alive again by her family. At 10:42 p.m., two police officers were dispatched to search for the victim. Thereafter, they found the minivan that she had been driving in a ditch at Luzerne Lake, approximately 1.5 miles from the mini-mart. The officers followed a four to five hundred foot trail of blood on a gravel roadway from the van. The unclothed body of the victim was found floating in the water. Her throat had been slashed twice with each cut approximately 3.5 to 4 inches long. Her windpipe was totally severed. She actually died of drowning.

The police questioned Woodall when they learned that he had been in the mini-mart on Saturday night. He gave two conflicting statements about his activities on the night of the murder after he left work. The police observed that Woodall was wearing a brand of tennis shoe similar to the imprint on the pier next to where the body of the victim had been found. His fingerprints were on the van the victim was driving. Blood was found on his front door and muddy and wet clothing under his bed. Blood on his clothing and sweatshirt were consistent with the blood of the victim. The DNA on the vaginal swabs was consistent with his. His fingerprints were identified on the glass and door of the van as well as the interior doorjamb and handle. On March 18, 1997, the Muhlenberg County Grand Jury indicted him for murder, kidnapping and rape. One week later, the Commonwealth announced its intention to seek the death penalty. Venue for the prosecution was changed from Muhlenberg to Caldwell County because of massive publicity.

On appeal, Woodall raises 28 assignments of alleged error. We have carefully

reviewed all the issues presented and this opinion will concentrate first on those issues that were orally argued. All the allegations presented will be discussed.

## I. No Adverse Inference Instruction

■ Woodall argues that he was denied due process, his right not to testify and a reliable sentence determination when the trial judge refused to instruct the jury to draw no adverse inference from the decision of Woodall not to testify during the penalty trial. Woodall pled guilty to all of the charged crimes as well as the aggravating circumstances. The no adverse inference instruction is used to protect a non-testifying defendant from seeming to be guilty to the jury because of a decision not to testify. That is not the situation presented here. The instruction contemplated by *Carter v. Kentucky*, 450 U.S. 288, 101 S.Ct. 1112, 67 L.Ed.2d 241 (1981), could not have changed the outcome of a guilty determination that the defendant acknowledged by his admission of guilt. There was no reason or need for the jury to make any additional inferences of guilt.

■ There is no error in this respect. Any possible error would be nonprejudicial because the defendant admitted the crimes and the evidence of guilt is overwhelming. Woodall claims that *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), extended Fifth Amendment protection and thus the *Carter, supra,* rule to the penalty phase of a trial. *Estelle, supra,* is not a jury instruction case, unlike *Carter*. *Estelle* does not cite to *Carter* or indicate that *Carter* has been extended. The factual situation in *Estelle* is different from that presented in this case because it involved the use of an out-of-court statement the defendant made to a government expert. The statement in that case was in regard to a psychological examination by the government prosecutors which was used

against the defendant without warning in the penalty trial. Neither *Carter* nor *Estelle* involved a guilty plea. Here, Woodall admitted guilt to all charges and did not contest the facts. He was not compelled to testify so there were no words that could be used against him so as to implicate the Fifth Amendment privilege as in *Estelle.*

Woodall contends that *Mitchell v. United States,* 526 U.S. 314, 119 S.Ct. 1307, 143 L.Ed.2d 424 (1999), permits a guilty plea which does not waive the privilege against self-incrimination at the sentencing phase. *Mitchell, supra,* does not apply here. In *Mitchell,* the defendant pled guilty to federal charges of conspiring to distribute five or more kilograms of cocaine and of distributing cocaine within 1000 feet of a school or playground. She reserved the right to contest the amount of the cocaine at the penalty phase. The amount of the cocaine would determine the range of penalties. She only admitted that she had done "some of" the conduct charged. She did not testify. Three other codefendants did testify as to the amount of cocaine she had sold. Ultimately, the U.S. Supreme Court ruled that it would not permit a negative inference to be drawn about her guilt with regard to the factual determination respecting the circumstances and details of the crime. Here, Woodall did not contest any of the facts or aggravating circumstances surrounding the crimes.

The decision of the trial court not to give an adverse inference instruction does not amount to constitutional error so as to require reversal. There is no violation of any section of the United States or Kentucky Constitution.

## II. Restrictions on Voir Dire

■ Woodall contends that the trial judge placed excessive and unfair restrictions on his ability to develop information

about jurors on voir dire and as a result, his right to . exercise peremptory challenges intelligently and his guarantee of a fair and impartial jury were violated. He claims that the trial judge repeatedly and severely curtailed his ability to question jurors during voir dire. There can be no question that an adequate voir dire examination is essential to the seating of a fair and impartial jury. This is particularly true in a death penalty case where an adequate voir dire process has been held to be mandatory. *Morris v. Commonwealth*, Ky., 766 S.W.2d 58 (1989).

■ A) It was not an abuse of discretion by the trial judge to restrict the voir dire of Woodall concerning specific mitigation evidence which he planned to present. The trial judge permitted Woodall to ask general mitigation questions, but prohibited questions about specific mitigating factors such as the low I.Q. attributed to Woodall. Federal courts have recognized that denying a defendant the right to voir dire jurors on specific mitigating factors is not an abuse of discretion. *See U.S. v. Tipton*, 90 F.3d 861 (4th Cir.1996); *U.S. v. McVeigh*, 153 F.3d 1166 (10th Cir.1998).

■ As in *Tipton, supra,* Woodall sought to question the jury about specific mitigating circumstances rather than a generalized inquiry as allowed by the trial judge. Here, the trial judge had asked jurors on individual voir dire whether they were willing to consider the entire range of penalties and had also asked them if they were willing to consider mitigating evidence. The judge permitted Woodall to question jurors extensively regarding mitigating circumstances so long as the questions were general and did not inquire into specific mitigation. The trial judge has broad discretion in the area of questioning on voir dire. *Ward v. Commonwealth*, Ky., 695 S.W.2d 404 (1985). Questions are not competent when their evident purpose

is to have jurors indicate in advance or to commit themselves to certain ideas and views upon final submission of the case to them. *Ward, supra.* The mere fact that more detailed questioning might have somehow helped the accused in exercising peremptory challenges does not suffice to show abuse of the discretion in conducting the examination. *See Tipton, supra; see also, Annotation,* "Propriety and Effect of Asking Prospective Jurors Hypothetical Questions, on Voir Dire, as to How They Would Decide Issues of the Case." 99 A.L.R.2d 7; *see also Commonwealth v. Moon*, 389 Pa. 304, 132 A.2d 224 (1957), *cert. dismissed,* 355 U.S. 908, 78 S.Ct. 335, 2 L.Ed.2d 270; *Commonwealth v. Everett*, 262 Pa.Super. 61, 396 A.2d 645 (1978).

Woodall was trying to get jurors to indicate in advance what their views were regarding his I.Q. of 74. He was seeking to oblige jurors to commit themselves by either accepting a specific mitigator or rejecting it before any evidence was heard. The trial judge was attempting to protect against such danger and did not abuse his broad discretion. It should be recalled that in 1991, I.Q. testing measured Woodall's I.Q. at 74, and in 1998, a prosecution psychologist measured his full-scale I.Q. at 78. Both scores are 4 to 8 points respectively higher than the definition of a seriously mentally retarded offender as found in KRS 532.130(2). KRS 532.140 does not permit execution of a person below an I.Q. of 70.

■ B) Woodall complains that the trial judge abused his discretion by denying voir dire examination into the attitudes of the jurors regarding the right of Woodall to remain silent. We disagree. The trial judge correctly refused to allow proposed questions on the Fifth Amendment rights of the accused. There was no error on the part of the trial judge in this respect and in any event, it is nonprejudicial

and harmless beyond a reasonable doubt as noted earlier.

■ C) It was not an abuse of discretion for the trial judge to deny extensive voir dire examination into the views of the jurors regarding capital punishment. Initially the trial judge examined the jurors on the entire range of penalties from 20 years to death. Woodall was also given the opportunity to voir dire the jurors in a like manner. The individual voir dire required by RCr 9.38 by both the trial judge, counsel for the defendant and the prosecutor was adequate. The general and individual examination of each juror conducted by the trial judge was sufficient and satisfied the rule requiring that defense counsel be permitted to ask questions regarding capital punishment.

■ D) It was not error for the trial judge to deny Woodall an opportunity to voir dire on the subject of whether the jury must be unanimous in its findings of mitigation. Again, the trial judge has broad discretion to supervise the voir dire examination. If there was any confusion in the mind of the jury about mitigating circumstances at the voir dire stage, it was clearly resolved by the jury instructions which were proper. It was clear to the jurors that if one of them believed that Woodall did not deserve the death penalty, they could not return a verdict of death. The trial judge did not abuse his discretion by not permitting further inquiry by Woodall in this regard.

■ E) The refusal of the trial judge to permit defense counsel to voir dire potential jurors on their opinions about the differences in the burden of proof for mitigating circumstances and aggravating circumstances does not amount to reversible error. Mitigating circumstances do not have to be proven beyond a reasonable doubt. *See Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). On the other hand, KRS 532.025(3) requires aggravating circumstances to be proved beyond a reasonable doubt. Such a difference is not a disparity which would give rise to either a challenge for cause or a peremptory.

■ F) The denial by the trial judge of voir dire questions as to whether the jurors believed the death penalty was necessary does not constitute reversible error. The trial judge prohibited defense counsel from asking the question, "Do you feel the death penalty is a necessary punishment." The trial judge did not violate his broad discretion in such matters.

■ G) Woodall argues that whether jurors can base their verdict on evidence is a separate inquiry from whether they can consider minimum sentences. He contends that the qualification placed on the questioning about the ability to consider minimum sentences was improper. The trial judge directed that the jurors only had to be able to consider a minimum sentence "if warranted by the evidence," and that such qualifications on the question were designed to conceal bias and not to disclose it.

■ Again, there is no question that Woodall is entitled to a jury that can fairly consider the entire range of punishments for his crimes. *Grooms v. Commonwealth,* Ky., 756 S.W.2d 131 (1988). It was proper for the trial judge to make it abundantly clear to the jurors that they must consider their verdict in light of the instructions given to them by the court and the evidence presented. The qualifying language required by the trial judge was proper and made it clear that if the instructions and the evidence so warranted, they could consider a minimum penalty. That is all that is required by the law. *See Hodge v. Commonwealth,* Ky., 17 S.W.3d 824 (2000);

*Bowling v. Commonwealth,* Ky., 873 S.W.2d 175 (1993).

H) It was not an abuse of discretion for the trial judge to refuse to permit Woodall to ask certain questions on the jury personal data questionnaire because many of those questions had either been already asked by the judge or counsel or were improper in any event. Prior to the entry of the guilty plea, the trial judge had spontaneously prepared a questionnaire and mailed it to jurors. Illness required that the original defense counsel be replaced by new defense counsel and the new defense counsel requested that the same juror questionnaire be sent to potential jurors for the sentencing hearing.

■■■ Woodall complains his right to an impartial jury was compromised when the trial judge refused to allow him to ask certain questions in voir dire that the trial judge had previously listed on a pretrial questionnaire that the judge intended to send to all jurors. Woodall complains because some of the questions he tendered to the court in a pretrial motion were not allowed. There was no abuse by the trial judge of his broad discretion on issues involving voir dire. *Ward, supra.* The trial judge made clear his grounds for refusing to allow certain questions to be asked. The jury questionnaire form already contained general questions regarding occupation and other questions were considered to be too invasive when balanced against the limited amount of information they were likely to provide. The trial judge did not abuse his discretion in any respect.

### III. Jurors Not Struck for Cause

■■■ Woodall argues that the trial judge abused his discretion by failing to strike six allegedly unqualified jurors for cause and thereby violated his right to an impartial jury and impaired his use of peremptory challenges. Woodall used all ten of his peremptory challenges; three of the peremptory challenges were exercised on jurors he had sought to remove for cause. He also unsuccessfully challenged for cause three of the twelve jurors who sat on the case. Motions to strike jurors for cause are within the sound discretion of the trial judge. *Bowling, supra.*

■■■ In regard to Juror 278, the allegation that she was impaired because her sister had been raped is without merit. The refusal to strike jurors for cause because they had previously been victims of violent crimes has been repeatedly upheld. *See Hodge; Stoker v. Commonwealth,* Ky., 828 S.W.2d 619 (1992). Here, the crime victim was the juror's sister rather than herself. There was no cause for strike.

■■■ It was never established that the employment of the juror at the Kentucky State Penitentiary gave her any special knowledge about parole, and there is no authority for the proposition that mere knowledge about parole eligibility is a basis for a challenge for cause. The trial judge recognized the fact that the potential juror was taking antidepressant medication and properly believed that she could serve if necessary. *Bowling, supra.* There was no abuse of discretion in regard to the potential juror. The contention that the juror was biased because her daughter's band competed against the victim's band was unsupported by the record.

■■■ Juror No. 176 possessed no special knowledge that could have influenced other jurors. The argument that the juror was situationally impaired because she had worked at the mini-market for one month more than six months after the crime occurred is without merit. The juror specifically denied on voir dire that she knew one of the prosecution witnesses and there was no evidence to substantiate the claim by

Woodall. The juror indicated on voir dire that any conversations she may have had with fellow workers at the mini-mart were of a general nature. There was no abuse of discretion in refusing to strike the juror for cause.

■■■■■ Juror No. 94. Woodall argues that the juror should have been struck for cause because she could not consider a minimum sentence. The record shows that the juror indicated on two different occasions that she could consider the entire range of penalties. In response to the trial judge's question of whether she could consider a twenty-year sentence if so instructed, she answered she could if it were supported by the evidence. Although a juror is disqualified if he or she cannot consider the minimum penalty pursuant to *Grooms, supra,* excusal for cause is not required merely because the juror favors severe penalties, so long as he or she will consider the full range of penalties. *Hodge, citing Bowling.* Per se disqualification is not required merely because a juror does not instantly embrace every legal concept presented during voir dire examination. *Hodge.*

■■■ Woodall claims that Juror No. 185 should have been excused for cause pursuant to KRS 29A.080(2)(d) because he had an insufficient knowledge of the English language and was unable to understand what was being said in voir dire. Woodall also argues that the juror never indicated whether he could consider I.Q. of 74 of Woodall as a mitigating factor. No. 185 sat as a juror. He stated on two separate occasions that he could consider mitigating evidence and follow the instructions of the trial judge on mitigating evidence. During voir dire, the juror stated he could consider someone's stability as a mitigating circumstance. There was no abuse of discretion in denying the motion to strike for cause.

■■■ Juror No. 16 was removed from the case by peremptory challenge after a motion to strike for cause had been denied. Woodall claims that the juror was impaired because he could not consider mitigating evidence. Although the juror may have been temporarily confused on voir dire, he finally indicated that he would consider mitigating evidence, "If the court instructs me that way." The juror satisfied the requirements of *Grooms, supra,* and the trial judge did not abuse his discretion in refusing to strike the juror for cause.

■■■ Potential Juror No. 8 was peremptorily challenged after the trial judge had refused to strike him for cause. Woodall complains that the motion for cause was denied because the juror had properly answered what he labels as the "leading questions" by the judge about considering the entire range of punishment. When initially asked if he could consider a 20-year minimum sentence, the juror answered "I don't know," and later proclaimed that he was for the death penalty. After appropriate rehabilitation by the trial judge, the juror indicated that he would base any decision in the case as to punishment on the evidence presented. The trial judge did not use leading questions in order to elicit such an answer. The proscription provided in *Montgomery v. Commonwealth,* Ky., 819 S.W.2d 713 (1991), is not applicable.

The refusal of the trial judge to strike jurors for cause did not violate the right to a fair and impartial jury and did not unnecessarily compromise his use of the allotted peremptory challenges.

## IV. Jurors Who Should Not Have Been Struck for Cause

Woodall claims that the trial judge abused his discretion by striking two po-

tential jurors for cause and that the alleged wrongful exclusion of the jurors is not subject to a harmless error analysis. We will refer to the two jurors in question as the first juror and the second juror in order to respect their privacy as we have done with the jurors in the previous section of this Opinion.

■ Initially, we must observe that jurors who are substantially impaired in their ability to impose a death sentence may be excused for cause. *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985).

■ After an exhaustive examination of the record in regard to the first potential juror, we conclude that the trial judge did not abuse his discretion in excusing her for cause. The potential juror was relatively articulate and knowledgeable about the different range of penalties available in the case. She expressed a considerable interest in a penalty of life in prison for 25 years without hope of parole. Near the end of the voir dire by the prosecution, she clearly stated that she did not like capital punishment and that she would not consider it period. Although the potential juror was 78 years old, she seemed to be in full command of her faculties and knowledgeable about the legal system.

■ The second juror indicated a hesitancy and an ambivalence about the death penalty. When asked if he could consider the range of possible punishments, including death, he answered "No sir, I don't think I could do that." Later, when asked if he could consider death if the judge instructed the jurors to give each one fair consideration, the juror answered, "I don't think I consider the death penalty as far as something like that, no sir." The second juror was struck for cause and the defense made no objection. Both jurors were properly struck for cause.

## V. Batson Issue

■ Woodall argues that he was denied due process and equal protection of the law because the trial judge failed to conduct an inquiry into and make findings of fact concerning the alleged discriminatory intent and credibility of the reasons given by the prosecutor for a peremptory challenge of the only African American in the final jury pool. At the conclusion of the voir dire examination, only one African American remained in the jury pool. The other African American called for jury duty had been challenged and removed for cause. No motion was made to strike the remaining juror for cause but the prosecution exercised a peremptory strike against her. In a response to an objection by the defense, the prosecutor stated that the juror had been struck because she answered a question on a jury questionnaire to the effect that she "did not trust anyone." Woodall contends that the prosecution struck the juror solely because of her race in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986)

■ In *Batson, supra,* the United States Supreme Court promulgated a three step process for determining whether peremptory challenges had been properly exercised. First, a defendant must establish a prima facie case of racial discrimination. Second, the prosecutor must provide a race neutral reason for the exercise of the peremptory challenge, and third, the trial court is to conduct an inquiry into the ultimate question of whether there was discriminatory intent in the exercise of the peremptory challenge. Our examination of the record in this case indicates that the justification for striking peremptorily the one remaining African American juror was not a pretext for racial discrimination. The Commonwealth can

rely on a jury questionnaire to derive its race neutral reasons for striking a juror. *Commonwealth v. Snodgrass,* Ky., 831 S.W.2d 176 (1992). An attitude of mistrust expressed on a juror questionnaire should be given the same weight as an attitude of mistrust or bias expressed by a juror on voir dire examination. *Batson* was not intended to remove all prosecutorial discretion as to the use of peremptory challenges but only to eliminate the obviously bad practice of eliminating potential jurors because of their race only. The evaluation of whether the offered reasons for a prosecutorial challenge remains in the sound discretion of the trial judge. *See U.S. v. McMillon,* 14 F.3d 948 (4th Cir.1994), which stated in part that the trial court, present on the scene, found the reasons articulated were both nondiscriminatory and actual. Under all the circumstances, the trial judge did not abuse his discretion by rejecting the *Batson* challenge.

## VI. Presentence Sexual Offender Treatment Program Evaluation

█ Woodall argues that the use by the trial judge of statements made by him during a sex offender treatment evaluation, which the trial judge ordered after he pled guilty but before his penalty trial and sentencing, to sentence him to death and to the terms of imprisonment violated Kentucky law and the federal and state constitutions. He claims that the trial judge used the statements to sentence him to death and a term of years imprisonment which was a violation of his right against self-incrimination. We disagree.

Woodall made no incriminating statements about the crimes for which he had already pled guilty. He denied remembering the circumstances surrounding the crimes. None of his rights were violated.

Approximately one week after Woodall pled guilty, the trial judge ordered an evaluation be conducted pursuant to KRS 532.050(4) by the sex offender treatment program. Defense counsel objected to the evaluation and the trial judge stated that he would not release the report to the defense nor the prosecution until after the penalty trial had been completed. The report stated that Woodall was extremely guarded in answering all questions and most responses were extraordinarily brief in nature. The evaluator observed that the interview was abbreviated and further limited by the defendant's professed inability to recall any specific events surrounding the offense.

█ The trial judge properly ordered the report pursuant to KRS 532.050(4) which provides in part that if a defendant has been convicted of rape, the court shall, prior to determining the sentence, order an evaluation to be conducted by the sex offender treatment program. Subsection 1 of the statute does not preclude the trial judge from ordering a presentence investigation report simply because this is a capital case. The statute does not require a presentence investigation report, but neither does it preclude such a report. The presentence investigation report is different from the sexual offender evaluation in subsection 4 of the statute.

The report was not used during the penalty phase and was not given to either counsel until the time of sentencing when the trial judge approved the sentence as fixed by the jury. Pursuant to KRS 532.025 and 532.050, it is the duty of the trial judge to impose an appropriate sentence for the individual once guilt has been determined. Here, Woodall pled guilty and so there is no authority to prevent the trial judge from ordering the sex offender evaluation and the presentence report. Before pronouncing sentence, the trial

judge gave the defendant the opportunity to make any amendments, alterations or changes to any of the reports. Woodall did submit some letters on his behalf but did not make a request for amendments, corrections or make objections. There is no evidence that the trial judge considered any statement made by Woodall during the evaluation in reaching the sentence ultimately imposed. The rights of the accused were not violated because he made no incriminating statements during the evaluation.

*Mitchell v. United States*, 526 U.S. 314, 119 S.Ct. 1307, 143 L.Ed.2d 424 (1999), is not applicable because it is factually different. In *Mitchell, supra,* the defendant did not deny committing crimes but only admitted some of the offenses she was charged with. Here the silence of Woodall did not cause the judge to assume that he had committed other crimes. He had already admitted committing the offenses when he pled guilty.

Woodall never expressed any remorse during the trial and the trial judge considered the lack of expression of remorse when he followed the penalty fixed by the jury, however, there is no evidence the trial judge assumed lack of remorse from the evaluation report. We find relying on the principles in *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), unpersuasive. In *Estelle, supra,* the Supreme Court held that the prosecution's use of psychiatric testimony at the sentencing phase of the defendant's capital murder trial to establish his future dangerousness violated his constitutional rights. Here, there is simply no evidence that the trial judge used the statements of Woodall during the evaluation to establish lack of remorse or the appropriateness of the penalties fixed by the jury.

## VII. Questioning of Jurors During Voir Dire

Woodall argues that the trial judge erred when he questioned three jurors about pretrial publicity in open court in front of the entire jury panel, and excused three of them for cause. Defense counsel requested that further questioning be held out of the hearing of the other jurors, but the trial judge refused.

Woodall claims that he has a right, pursuant to RCr 9.38 to individually voir dire each of the excused jurors about the range of penalties in a death penalty case and about pretrial publicity. Woodall also contends that the questioning of these jurors tainted the entire jury panel because it educated jurors who wanted to remain on the panel about what they needed to say to avoid being removed for cause.

The landmark case regarding the questioning of the jury panel about pretrial publicity was *Morris v. Commonwealth,* Ky., 766 S.W.2d 58 (1989). In that case, the trial judge failed to conduct any individual voir dire on the matter of pretrial publicity, choosing instead to question the entire panel. *Morris, supra,* highlights the danger of questioning jurors in front of the entire panel about pretrial publicity is that one member of the panel might slip a piece of information that taints the entire group. Consequently, *Morris* specifically condemns asking specific questions about what information a jury panel member may have gathered outside the courtroom.

During the trial judge's general voir dire, the initial panel of 74 prospective jurors was asked if any had "either read about this case in the newspaper, seen something on T.V., or heard something about it on the radio, or otherwise have had some kind of prior exposure to this case?" A number of prospective jurors raised their hands. The judge then asked:

Due to what you have read, seen, or heard about this case, would any of you who have raised your hand that would be unable to consider—to consider the entire range of penalties given to you by the Court and warranted by the evidence? Is there any of you who—quite a few of you who have read, heard, or seen, maybe even heard talk about this case—will be unable due to seeing, hearing, or reading about it to consider the entire range of penalties, and I'm telling you that there will be a range of penalties given to you by the Court and warranted by the evidence? Anybody unable to do that of this 74?

Defense counsel then stated, "I would ask the Court to have the discussion with the juror at the bench outside the hearing of the other jurors." The trial court responded, "Okay. Well let me finish first." Despite not having been advised of the range of penalties, three prospective jurors raised their hands. The trial judge continued:

Dorothy Call. Okay. Anyone else who will be unable to consider the entire penalty range if you were selected as a juror in this case? Mr. Wells, and Mr. Flick, and Ms. Call, are you telling the Court that you would be unable because of pretrial publicity or whatever to consider the full range of penalties? Is that what you all are telling the Court?

When all three jurors responded in the affirmative, the trial judge excused the three without eliciting from them what information each had obtained that would prevent him/her from considering the full range of penalties.

RCr 9.38 provides in part:

When the Commonwealth seeks the death penalty, individual voir dire out of the presence of other prospective jurors is required if questions regarding capital punishment, race or pretrial publicity

are propounded. Further, upon request, the Court shall permit the attorney for the defendant and the Commonwealth to conduct the examination on these issues.

Woodall does not argue that his counsel requested permission to question these jurors with respect to either pretrial publicity or capital punishment, but only claims that any question in open court that relates to pretrial publicity violates the rule. As we explained in *Morris:*

The reason for the change in the rule and the reason for this ruling are the same. When there has been extensive pre-trial publicity, great care must be exercised on voir dire examination to ascertain just what information a prospective juror has accumulated. In the absence of individual voir dire, a disqualifying item of knowledge or a rumor voiced by one panelist—even inadvertently—may well taint the entire panel.

*Id.* at 59–60; *see also, Tamme v. Commonwealth,* Ky., 973 S.W.2d 13, 24 (1998), *cert. denied,* 525 U.S. 1153, 119 S.Ct. 1056, 143 L.Ed.2d 61 (1999); *Thompson v. Commonwealth,* Ky., 862 S.W.2d 871, 874 (1993). Although we regard what occurred here as at least a technical violation of RCr 9.38 and potentially dangerous, the error in this instance was harmless as no information was stated in open court that could have tainted the other members of the panel.

Woodall, however, asserts that even though the three excused jurors imparted no prejudicial information about the case to the other members of the panel, any remaining potential jurors who *wanted* to serve on the case would now know what *not* to say to avoid being excused for cause. We think the converse to be more likely, *i.e.,* that jurors who did not want to sit on a lengthy and difficult case would know what to say in order to be excused for cause. Regardless, neither scenario is

within the contemplation of RCr 9.38; and both are as meritless as would be an assertion that jurors would give dishonest answers to other voir dire questions for the purpose of being or not being excused from the panel. There is no proof that any prospective jurors actually gave false answers under oath to voir dire questions for the purpose of ensuring their acceptance or rejection as jurors on this case; and we will not predicate reversible error on the assumption that they knew how to do so had they been so inclined.

We will now consider those arguments raised in the briefs, but not orally argued. This Court has fully considered all the arguments presented by Woodall.

### VIII. Prosecutor's Closing Argument

Woodall maintains that there were numerous improper and prejudicial comments by the prosecutor during closing arguments, all of which resulted in denying due process and a reliable determination of his sentences.

Woodall claims that

A) The prosecutor appealed to the jurors' sense of responsibility to the community.

B) That the prosecutor expressed his personal opinion that death was the only *true punishment and that for the sake of justice, the returning of such a penalty was the right thing to do.*

C) The prosecutor improperly contrasted the pure goodness of the victim and sympathy for her family against the evil of the defendant.

D) The prosecutor improperly commented on the silence of the defendant at trial and denigrated the defense for allowing him not to testify.

E) The prosecutor misstated evidence and asked the jury to speculate about matters not in evidence.

F) The prosecutor misstated the law and nullified the instructions of the court concerning mitigating circumstances.

 The prosecutor did not improperly appeal to the jury's sense of responsibility to the community. A prosecutor may call on a jury to do its duty. *Slaughter v. Commonwealth,* Ky., 744 S.W.2d 407 (1988).

 It should be noted that there were objections to portions of the closing statement by the prosecutor, but no objection was made to the errors alleged under this issue. It was not improper for the prosecutor to give his interpretation of the evidence and his recommendation as to the punishment. *See Hamilton v. Commonwealth,* Ky., 401 S.W.2d 80 (1966). The prosecutor's argument was merely to give his recommendation based on the facts presented as well as the guilty plea, including the aggravating circumstances. The comments of the prosecutor were not inappropriate. The statements made by the prosecutor about both victim and defendant are not the basis for error. All of the comments made by the prosecutor were supported by the evidence. Of course, the defense had the opportunity for final closing arguments and response as thought to be necessary.

 The Commonwealth may portray the reality of the violence, giving some background and information regarding the victim in order to give a full understanding of the nature of the crime. *Bowling.* In a concurring opinion, it has been stated that a prosecutor can provide the fact finder with a quick glimpse of the life the criminal chose to end so as to remind the jury that the victim was a unique human being. *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). We agree. We have found no

error in bringing to the attention of the jury that the victim was a living person, more than just a nameless void left somewhere on the face of the community. *McQueen v. Commonwealth,* Ky., 669 S.W.2d 519 (1984). The references to the victim and her family did not in any way deprive Woodall of a fair and impartial trial. Victim impact evidence is another method of informing the sentencing authority about the specific harm caused by the crime. *Payne, supra.*

 There was no improper reference to the lack of remorse or silence by the accused. We find nothing in the remarks of the prosecutor that refers to the lack of remorse or silence, but only in emphasis on the fact that Woodall pled guilty after he realized the amount of evidence the state had against him. The remarks used in this case are only a comment on defense strategy by the prosecutor. *Slaughter, supra.* The prosecutor was entitled to make a comment on the demeanor of Woodall in the courtroom. There was no objection to this comment and no prejudice resulted. It did not refer to a lack of remorse or silence or failure to testify. The prosecutor did not urge the jury to consider the plea as an aggravator.

 The comments by the prosecutor were reasonable inferences drawn from the evidence. The prosecutor did not misstate evidence or ask the jury to speculate about matters not in evidence. Clearly, the prosecutor can give his opinion of the evidence. *Cf. Tamme v. Commonwealth,* Ky., 973 S.W.2d 13 (1998). In addition, the evidence supports the inference that the clothing of the victim had been forcefully removed. The prosecutor did not improperly comment on the fact that a defense witness testified on direct examination that during the course of three years, Woodall sexually abused both of her daughters, and that he had gone to prison

for sexually abusing another girl and not her two daughters. The prosecutor merely made a reasonable inference that it was unknown how many counts of sexual abuse were outstanding based on the evidence.

 The mere phrase used by the prosecutor, "When does it end?" does not imply that Woodall would continue to be dangerous so as to invoke the condemnation expressed in *Ice v. Commonwealth,* Ky., 667 S.W.2d 671 (1984). This Court has recently approved the consideration by the jury of future dangerousness in *Hodge v. Commonwealth, supra,* quoting *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct 2187, 129 L.Ed.2d 133 (1994).

 Finally, the prosecutor did not misstate the law or nullify the jury instructions regarding mitigating circumstances. The prosecutor is entitled to argue that mitigating evidence is entitled to very little weight. *See Tamme.* Defense counsel argued extensively to the jury about all the mitigating factors. Woodall has shown no actual prejudice. Many of the allegations presented under this assignment of error suggest that the decision at trial not to object was only trial strategy.

## IX. Instructions on Mitigators

The trial judge did not err in giving an instruction on mitigating circumstances to the jury where that instruction did not require that mitigating circumstances be found unanimously or beyond a reasonable doubt.

 Woodall claims that the trial court submitted an instruction that required the jury to find mitigating circumstances unanimously and beyond a reasonable doubt. He contends that the jury instructions, when read as a whole and given their common sense meaning, lead to a conclusion that the entire jury had to be unanimous. We find such argument un-

convincing. This Court has repeatedly indicated that an instruction on unanimous findings on mitigation is not required. *Bowling.* This situation does not violate the doctrine set out in *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), because there was no requirement the jurors unanimously reach a conclusion regarding any mitigating factor. Each individual juror was free to examine and react to any mitigating factor when determining the appropriate sentence. Any juror who found a mitigating factor could use that fact to prevent the unanimous sentence of death.

### X. Denial of Funding

The trial judge did not abuse his discretion by denying the motion for funding to conduct a PET scan and other psychological testing. Woodall argues that there was a reasonable necessity for the tests and that he was deprived of due process as a result of the denial.

At a hearing on his motion, Woodall sought funding for the brain imaging procedure known as "Positron Emissions Tomography" or PET. He alleged that he suffered from various brain disorders and the PET scan would allow an evaluation to be made about certain portions of the brain that may not be functioning appropriately. Dr. Eric Drogin, a psychologist and attorney employed by the defense, testified at the hearing conducted by the trial court. He stated that he had met Woodall twice, once for 5 1/2 hours and another time for 45 minutes. He did not issue a written report on either occasion and he did not do a separate psychological history of Woodall but rather relied on the history provided by the Kentucky Correctional Psychiatric Center (KCPC) as prepared by Dr. Richard Johnson.

The report prepared by KCPC indicated that Woodall had been observed as an inpatient around the clock and a series of clinical and forensic interviews had been conducted by Dr. Johnson. Dr. Johnson testified for Woodall at the penalty phase of the trial and his report was introduced as mitigating evidence.

The Kentucky standard for review of this claim is whether there was a reasonable necessity for funding to conduct additional neuropsychological testing. *Sommers v. Commonwealth,* Ky., 843 S.W.2d 879 (1992). The trial judge correctly determined that the testimony of defense witness Dr. Drogin was unpersuasive because the psychologist had not spent much time with defendant, had not kept records and had not issued a written report. In addition, he had not done a psychological history of the defendant. The KCPC report specifically eliminated the possibility of organic brain damage. We find no error in the decision of the trial judge in declining to grant a continuance or to allow funding for additional testing. *See Simmons v. Commonwealth,* Ky., 746 S.W.2d 393 (1988), in a case which determined whether the defendant in that matter was competent to stand trial.

We are not persuaded by the reliance on *Binion v. Commonwealth,* Ky., 891 S.W.2d 383 (1995) because it is factually distinguishable. In that case the KCPC report mentioned the possibility of an organic brain defect and there was a strong factual basis for his claim that additional testing was reasonably necessary.

### XI. Mental Health Evaluation by KCPC

Woodall contends that the trial judge was not authorized by KRS 504.070, RCr 7.24 or by the decision of the prosecutor to seek death, to order that an evaluation be conducted by KCPC with regard to the mitigating evidence of I.Q. and psycho-

logical evaluation as sought by the prosecutor. Ultimately, the evaluation was introduced during the penalty phase of the trial by Woodall.

Woodall admits that he gave notice of possible mental health evidence and indicates that the examination was ordered over his objection. He contends that the KRS 504.070 authorizes an examination on behalf of the Commonwealth only if he gave notice of intent to introduce evidence of mental illness or insanity and that he only gave notice that he might introduce evidence of mental retardation. He claims that he was only offering the evidence as mitigation and not as evidence relating to guilt.

We are not persuaded by the attempt by Woodall to in effect hedge his notice and phrase it in such a way that he can later argue that it was not really notice. Nothing in KRS 504.070 states that the mental health evidence offered by the defendant must relate to the question of guilt rather than mitigation. The statute is silent about the evidence having to be a defense. The entire purpose of introducing the evidence was to mitigate punishment. RCr 7.24(3)(B) permits the court to order the defendant to submit to a mental examination at the request of the Commonwealth and upon notice from the defendant that he intends to introduce expert testimony relating to a mental disease or defect or any other mental condition of the defendant bearing on the issue of guilt. Here the mental retardation claim went to the level of culpability and the judge correctly ordered an examination on the motion of the Commonwealth. In any event, Woodall waived any claim that the evaluation violated his Fifth Amendment right against self-incrimination when he introduced the evaluation into evidence on his own behalf. *Cf. Buchanan v. Kentucky,* 483 U.S. 402, 107 S.Ct. 2906, 97 L.Ed.2d

336 (1987); and *Ohler v. United States,* 529 U.S. 753, 120 S.Ct. 1851, 146 L.Ed.2d 826 (2000), which state that a party introducing evidence cannot complain on appeal that the evidence was erroneously admitted. We find no error in the decision of the trial judge to order the KCPC evaluation.

## XII. Alleged Hearsay

Woodall argues that the trial judge erred in admitting a statement made by Dr. Johnson who was testifying as a defense psychologist regarding Woodall's failure to complete successfully a sex offender treatment program while in prison. The psychologist stated that the defendant had applied for and was admitted to a sex offender treatment program but was terminated due to excessive, unexcused absences. Woodall claims that the statement was inadmissible hearsay pursuant to KRE 802 and not covered by any hearsay exception. He claims that the admission of this evidence created in effect another aggravating circumstance of which Woodall was not properly notified.

The complained of remark was made in response to cross-examination by the prosecution about the prison records that Dr. Johnson had the opportunity to review. It is conceded by all that this question is unpreserved. The Commonwealth argues that any error arising from the admission of one offhand, marginally relevant reference to the failure to complete a sex offender program is harmless error.

The statement by Dr. Johnson was admissible under KRE 703 because it tended to show the basis of his opinion which was that Woodall was suffering from a variety of psychological ailments. The evidence is clear that Dr. Johnson relied on Woodall's psychological history when reaching his conclusions. He stated that a psychiatric social worker had prepared background and personal history on Woodall. The

doctor stated that he had examined hospital, school and prison records during his evaluation of the defendant. In his final report, the doctor specifically cited the failure to complete the sex offender program. The past history of the defendant, including his time in prison and the failure to complete the program had some role in the diagnosis. As noted by Dr. Drogin, a psychologist called by the defense, it is important to have as much of an understanding as possible of the background of a patient or defendant for the purposes of a forensic psychological evaluation. Thus, the testimony was properly admitted pursuant to KRE 703(a).

The trial judge did not err by not making a determination under KRE 703(b) that the information was trustworthy, necessary to illuminate testimony and unprivileged. Woodall made no objection to the information when it was offered and, consequently, the trial judge had no notice of any necessity to conduct an inquiry pursuant to KRE 703(b). The defendant did not request an admonishment pursuant to KRE 703(b) and thus was not entitled to one. No evidence was offered to demonstrate how Woodall was prejudiced by the comment of Dr. Johnson.

The statement by the psychologist did not amount to evidence of an aggravating circumstance. Dr. Johnson was presented as a defense witness with the intention of presenting mitigating psychological evidence. The questioning on cross-examination by the prosecution regarding the basis of his opinion was proper and was not an attempt to present an "unwritten" aggravating circumstance. It was not error to permit the jury to hear the statement by Dr. Johnson.

### XIII. Denial of Continuance

Woodall maintains that the trial judge abused his discretion by denying a motion for a continuance on June 12, 1998. He claims that the denial impaired his ability to present a mental health defense and otherwise denied him due process. Woodall was indicted on March 18, 1997 and his trial was set for October 28 of the same year. He sought and was granted a number of relatively routine pretrial continuances, examinations and even a change of venue. The defense received a continuance from February 23, 1998 until April 13 because of the unsatisfactory health of the lead counsel. On April 10, 1998, three days before the scheduled trial, Woodall entered his guilty plea and sought to continue the penalty phase because he needed the time to assess a mental health defense. The motion for continuance was denied and the night before the penalty phase was to begin, lead counsel was again stricken by illness. An experienced local attorney who had handled several capital cases in the past was appointed to the defense team. On June 12, 1998, she filed a motion for continuance claiming that she could not be prepared because of the complexity of the case. The motion was denied. The trial judge did not abuse his discretion by refusing the motion for continuance.

This Court has stated on several occasions that a trial judge has broad discretion in either granting or denying a continuance. The reviewing court should not reverse a criminal conviction unless the trial judge has abused his discretion in the denial of a continuance. *See Abbott v. Commonwealth*, Ky., 822 S.W.2d 417 (1992) and *Dishman v. Commonwealth*, Ky., 906 S.W.2d 335 (1995) *citing Pelfrey v. Commonwealth*, Ky., 842 S.W.2d 524 (1993).

Woodall claims that his case should be analyzed according to the factors set out in *Snodgrass v. Commonwealth*,

Ky., 814 S.W.2d 579 (1991). We have conducted such an analysis and find that the *Snodgrass* factors all favor the denial of an additional continuance. As observed in *Snodgrass,* a continuance is appropriate in a particular case depending on the unique facts and circumstances of that case.

> Factors the trial court is to consider in exercising its discretion are: length of delay; previous continuances; inconvenience to litigants, witnesses, counsel and the court; whether the delay is purposeful or caused by the accused; availability of other competent counsel; complexity of the case; and whether denying the continuance will lead to identifiable prejudice.

New counsel for Woodall did not specify the length of the delay in the continuance motion but simply lamented the fact that she had 40 to 50 people to interview and that it obviously would take a very long time. The trial judge had previously noted that the penalty phase was taking place almost 14 months after the crimes had occurred.

Previous continuances had resulted in a delay of almost nine months from the original trial date to the eventual penalty phase. The claim of medical necessity by the defense is without merit because there were other experienced attorneys who could have been assigned to the case when lead counsel became ill. There was definite inconvenience to the Commonwealth as a litigant because a number of witnesses it planned to call would have been greatly inconvenienced if the trial had been delayed yet again. The trial judge made particular reference to this fact in his denial of the March 30 continuance sought by the defendant. The trial judge indicated that he had a heavy schedule throughout August and September and could not delay the case without serious inconvenience to other litigants on his docket.

The fourth *Snodgrass* factor is whether the delay is purposeful or caused by the accused. Here the record indicates that Woodall challenged the request of the prosecution for a mental health evaluation from the outset of the attempts to evaluate him by seeking a writ of prohibition with the Court of Appeals and ultimately with this Court alleging irreversible injury if he was examined. On January 26, 1998, less than a month before the second scheduled trial date, he changed his position and then argued for continuance after continuance so he could have more time to prepare a mental health defense. In addition, substitute lead counsel was assigned the case on April 24, 1998 and indicated to the trial judge that she would be prepared by July 14, 1998, even though she realized that this was a death penalty case. We would also note that there was other competent and experienced counsel who was available for the entire year, except for July, and yet no one on the defense team contacted him regarding availability. Eventually the trial judge made the inquiry. Considering the delay factor and the availability of counsel, we cannot find any error in the trial court's ultimate decision.

The complexity of the case does not convince us that there was not sufficient time to prepare. The delay had been at least nine months and the only question was punishment as distinguished from guilt. Finally, there was no identifiable prejudice to Woodall because his counsel had adequate time to investigate his mental condition and to prepare a sufficient defense.

Consequently, as a result of an analysis of the *Snodgrass* factors, we find that the trial judge did not abuse his discretion in denying the final motion for continuance.

## XIV. Serologist Testimony

Woodall claims that the testimony of a serologist employed by the KSP forensic

department, called by the prosecution to testify about blood-spatter evidence was improperly admitted because the testimony was based on speculation and assumption. He also argues that the reenactment of the crime by the serologist was inaccurate and speculative.

■ The witness testified about photographs taken of the interior of the victim's van and over objection he testified that one stain was made by the face of the victim being mashed into the seat. The qualifications of the witness to discuss blood stain pattern had been stipulated, but there was objection that he was not a crime-scene reconstructionist who could give an opinion about the actual events that may have transpired during the crime.

The testimony of the serologist was supported by physical evidence and he referred to the location of the blood stains and explained his reasoning to the jury. The testimony was not based on assumption but was unbiased and objective.

Our review of the record does not indicate that there was any demonstration involved in the testimony of the witness. There was certainly no specific objection to any demonstration that is alleged. The description of the position of the victim when she left blood stains on the seat, conforms to the "substantial similarity" test provided in *United States v. Wanoskia*, 800 F.2d 235 (10th Cir.1986). There was no abuse of discretion on the part of the trial judge and the argument is without merit.

### XV. Crime Scene Photographs

■ The crime scene photographs that were seen by the jury were not gruesome, repetitive or inherently inflammatory. They were properly admitted into evidence. Woodall objected to seven photographs of the interior of the van of the victim, two photographs of her body and two photographs of her clothing.

Here, the photographic evidence proved the identity of the victim and the cause and manner of death. Even in circumstances where there is a guilty plea, the Commonwealth still has the burden of proving that aggravating circumstances exist and that there is a basis for the death penalty. It may introduce any relative and probative evidence necessary. *See Brown v. Commonwealth*, Ky., 934 S.W.2d 242 (1996). Relevant photographs are not inadmissible simply because they are gruesome and the crime is heinous. *See Clark v. Commonwealth*, Ky., 833 S.W.2d 793 (1991), *citing Brown v. Commonwealth*, Ky., 558 S.W.2d 599 (1977). The trial judge has broad discretion in such matters. *Sherley v. Commonwealth*, Ky., 889 S.W.2d 794 (1994). The trial judge did not abuse his discretion in admitting such evidence.

### XVI. Number of Peremptory Challenges

Woodall argues that because each side received ten peremptory challenges, he was entitled to have one more than the prosecution relying on *Springer v. Commonwealth*, Ky., 998 S.W.2d 439 (1999).

■ *Springer supra*, involves a situation where the defendants did not get the proper number of peremptory challenges. There is no constitutional right to peremptory challenges. *See McQueen v. Scroggy*, 99 F.3d 1302 (6th Cir.1996), *citing Ross v. Oklahoma*, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988).

■ Here there was no objection to each side getting ten strikes. Peremptory challenge claims are waived once the jury is sworn at trial. RCr 9.36(3); *United States v. Broadus*, 7 F.3d 460 (6th Cir. 1993). The trial judge equalized the number of challenges but did not reduce those available to Woodall. He received what he

was entitled to under the rules. RCr 9.40. *Springer* only applies when there is more than one defendant and, therefore, has no application here. The citations by Woodall to civil cases are unpersuasive.

## XVII. Recall of Character Witness

 The clerk at the mini-mart who was working on the night of the crime was originally called as a witness for the prosecution. Later in the trial the prosecution obtained permission to recall the clerk as a witness in order to introduce a statement that allegedly was made by Woodall when the two of them noticed a female acquaintance in the store. The witness said that Woodall said "Man, I'd like to have a piece of that." The prosecution stated that the remark was admissible to show the state of mind of Woodall.

Woodall argues that the statement was inadmissible pursuant to KRE 404(a) because it is character evidence which would reflect negatively on his character. Woodall contends that the testimony was evidence of future dangerousness, an aggravating circumstance that Woodall was not properly notified of.

We view this statement as an admission by Woodall to show intent and motive and is therefore admissible. The claim of future dangerousness as a statutory aggravator is not applicable.

## XVIII. Prior Statement of Witness

Prior consistent statements of the witness to a police officer about the mini-mart comment of Woodall were properly admitted. Although he disagrees, defense counsel challenged the trial testimony as being a recent fabrication. Defense counsel did attack the testimony of the witness as a recent fabrication and the introduction of the prior consistent statement was necessary to show that the statement was not fabricated.

KRE 801A(a)(2) provides that a prior consistent statement is admissible to rebut an expressed or implied charge against the declarant of recent fabrication or improper influence or motive. Counsel for Woodall first asked the witness if he had just forgot the statement, implying that it was not necessarily trustworthy or important. She also noted that the witness had spoken with the Commonwealth Attorney before he gave his testimony. All of this raises an inference that Woodall was attempting to imply that the testimony was not true.

The trial judge was not in error when he allowed the questions to be asked. The trial judge has the responsibility of determining the demeanor of the witness as well as that of counsel and included in that are the tone of voice and body language when the questions are propounded. We find no error in this situation.

## XIX. Guilty Plea

Woodall claims that his guilty plea was invalid because it was not a knowing, voluntary and intelligent waiver of his constitutional rights. He states that the plea was not entered voluntarily because of his low intelligence and the impairment of counsel and that he did not understand that he would be waiving his Fifth Amendment privilege by pleading guilty and finally that the trial judge did not adequately establish the factual basis for the plea. He concedes that this issue is unpreserved.

 Woodall specifically answered the questions of the court regarding the voluntariness of the plea in the affirmative on three different occasions. It is clear that Woodall understood all the consequences of his plea. Counsel made it clear that he had discussed the case with the defendant and he stated that he believed the plea to be voluntary. As stated in *Kotas v. Commonwealth*, Ky ., 565 S.W.2d

445 (1978), *citing Brady v. United States,* 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970), the validity of a guilty plea is determined not by reference to some magic words but from the totality of the circumstances surrounding it. Here, there was the necessary affirmative showing in the record that the plea was intelligently and voluntarily made as required by *Boykin v. Alabama,* 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), and noted in *Sparks v. Commonwealth,* Ky.App., 721 S.W.2d 726 (1986).

▆▆▆ There is no convincing evidence that defense counsel was impaired when he advised Woodall to plead guilty. There is a letter from counsel's physician stating that the lawyer was physically and emotionally exhausted but that was almost two months before the plea was entered. There was no indication that counsel was impaired during the plea colloquy, nor was health ever raised as an issue during the proceedings. The plea was properly accepted by the trial judge.

The claim by Woodall that he was not informed of the effect of the guilty plea is without merit. The defendant was fully informed of his rights by the trial judge. There is nothing in the record to indicate that he did not have a full and complete understanding of his rights and that he voluntarily chose to plead guilty.

The record indicates that the trial judge carefully explained the factual basis for each charge against Woodall who then admitted his guilt as to all charges. The procedure followed the requirements of *Henderson v. Morgan,* 426 U.S. 637, 96 S.Ct. 2253, 49 L.Ed.2d 108 (1976).

## XX. Double Jeopardy Claim

▆▆▆ Woodall maintains that the use of his rape conviction to enhance the murder conviction to a death eligible offense is a violation of double jeopardy principles be-cause neither offense required proof of an element that the other did not. He asserts that the use of the death to establish the physical injury requirement of first-degree rape and the use of the death again as an element in the murder conviction amounts to double enhancement.

Simply because the aggravating circumstance duplicates one of the underlying offenses does not mean that the defendant is being punished twice for the same offense. The underlying offenses were only factors to be considered as to whether the punishment for murder should be death. Woodall was not subjected to double jeopardy or multiple punishment for the same offense. *See, Sanders v. Commonwealth,* Ky., 801 S.W.2d 665 (1990); *Bowling v. Commonwealth,* Ky., 942 S.W.2d 293 (1997); *Perdue v. Commonwealth,* Ky., 916 S.W.2d 148 (1995); *Wilson v. Commonwealth,* Ky., 836 S.W.2d 872 (1992).

## XXI. Aggravating Enhancing Factors

▆▆▆ The trial judge properly relied on nonstatutory aggravating factors to enhance the sentence. Woodall claims that such use is unconstitutional. Similar arguments have been rejected by this Court in *Matthews v. Commonwealth,* Ky., 709 S.W.2d 414 (1986); *Mills v. Commonwealth,* Ky., 996 S.W.2d 473 (1999) and *Tamme v. Commonwealth,* Ky., 973 S.W.2d 13 (1998). The use of nonstatutory aggravating circumstances is permissible as long as the jury makes the required finding that at least one statutory aggravating circumstance exists. We find no error in this respect.

## XXII. Proportionality

Woodall contends that the death penalty is a disproportionate punishment as applied in this case. Specifically, he claims that this Court should conduct a propor-

tionality review and rule that his sentence is disproportionate because other criminal defendants who have committed similar crimes under similar circumstances were able to avoid the death penalty.

■ The United States Supreme Court has rejected the idea that this specific form of proportionality review is constitutionally required. *See Tuilaepa v. California*, 512 U.S. 967, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994). The Sixth Circuit has also rejected the argument in *McQueen v. Scroggy*, 99 F.3d 1302 (6th Cir.1996).

■■ However, this Court, pursuant to KRS 532.075 has reviewed the death sentence imposed in this case and concludes that it was not fixed under the influence of passion, prejudice or any other arbitrary factor. The evidence supports the finding of an aggravating circumstance. We have considered whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, as required by statute and have considered all circumstances of the crime committed here, and all of the evidence surrounding the defendant and his background. The information used in considering this penalty has been compiled in accordance with KRS 532.075(6)(a)(b) and (c). We have considered all the cases in which the death penalty was imposed since 1970 involving both the crime and the defendant. On the basis of this review, we have determined that the sentence of death in this case is not excessive or disproportionate to the penalty imposed in similar cases considering both the crimes and the defendant.

## XXIII. Statutory Guidance for Death Penalty

■ Woodall contends that the death penalty procedures do not provide directions to the judge and the fact finder on how the fact finder shall hear additional evidence in extension, mitigation and aggravation of punishment. This Court has previously rejected similar arguments in *Hodge, supra; Bowling, supra; Foley v. Commonwealth*, Ky., 942 S.W.2d 876 (1996); *Haight v. Commonwealth*, Ky., 938 S.W.2d 243 (1996). *See also Tuilaepa, supra; McQueen v. Scroggy, supra.* KRS 532.025 is constitutional.

## XXIV. Death Penalty Not Arbitrary

Woodall claims that the death penalty in Kentucky is unconstitutionally arbitrary and insidiously discriminatory. This Court has previously rejected similar arguments as stated above.

## XXV. Proportionality Review Constitutional

■ Woodall argues that the method of proportionality review conducted by this Court violates his due process rights because it defines similar cases as only those in which the death penalty was imposed. This argument has been repeatedly rejected by this Court. KRS 532.075 is constitutional.

■ Woodall also claims that he needs data required by KRS 532.075(6), regarding the application of capital punishment in Kentucky. Similar arguments have been previously rejected. *See Ex parte Farley*, Ky., 570 S.W.2d 617 (1978); *Gall v. Commonwealth*, Ky., 607 S.W.2d 97 (1980).

## XXVI. Penalty Phase Verdict Form

The verdict form used in this case and a number of other cases does not constitute reversible error. Similar arguments have been rejected in *Hodge, Foley, supra; Haight, supra;* and *Wilson v. Commonwealth*, Ky., 836 S.W.2d 872 (1992). Federal courts have also refused to grant relief. *See James v. Whitley*, 926 F.2d 1433,

(5th Cir.1991); *Flamer v. Delaware,* 68 F.3d 736 (3rd Cir.1995).

## XXVII. Death Qualification of Jury

■ Woodall asserts that his due process rights were violated because the jurors who were unwilling to agree to consider a death sentence were excused for cause. Similar arguments have been rejected by this Court in *Wilson, supra.* The U.S. Supreme Court has also rejected this type of argument in *Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986).

## XXVIII. Cumulative Error

There is no basis to claim cumulative error in this case. We have found no error that has existed in any of the other assignments of error by Woodall, and consequently we find no cumulative error. *Sanders v. Commonwealth,* 801 S.W.2d 665 (1991).

The judgment of conviction based on a guilty plea and the sentences of the circuit court are affirmed.

LAMBERT, C.J., COOPER, GRAVES, JOHNSTONE and WINTERSHEIMER, JJ., concur.

STUMBO, J., dissents by separate opinion in which KELLER, J., joins in part.

STUMBO, Justice, dissenting.

Respectfully, I must dissent from the majority opinion. My primary disagreement with the majority stems from the ruling that there was no error in the failure of the trial court to instruct the jury that no adverse inference should be drawn from Appellant's decision not to testify during the penalty phase of the trial. The majority opinion states that this is not an error because Appellant entered a guilty plea to the charges and the evidence of guilt was overwhelming. Because he pled guilty, according to the majority, a no adverse inference instruction could have no effect on a determination of guilt and, thus, no negative inferences could be drawn by the jury from Appellant's silence.

The plain language of *Mitchell v. United States,* 526 U.S. 314, 119 S.Ct. 1307, 143 L.Ed.2d 424 (1999), disputes the conclusion reached ̦by the majority. Therein, the United States Supreme Court stated as follows:

> The rule against adverse inferences from a defendant's silence in criminal proceedings, including sentencing, is of proven utility. Some years ago the Court expressed concern that "[t]oo many, even those who should be better advised, view this privilege as a shelter for wrongdoers. They too readily assume that those who invoke it are either guilty of crime or commit perjury in claiming the privilege." ... [T]here can be little doubt that the rule prohibiting an inference of guilt from a defendant's rightful silence has become an essential feature of our legal tradition.... The rule against adverse inferences is a vital instrument for teaching that the question in a criminal case is not whether the defendant committed the acts of which he is accused. The question is whether the Government has carried its burden to prove its allegations while respecting the defendant's individual rights. The Government retains the burden of proving facts relevant to the crime at the sentencing phase and cannot enlist the defendant in this process at the expense of the self-incrimination privilege.

*Mitchell,* 526 U.S. at 329, 119 S.Ct. 1307, quoting *Ullmann v. United States,* 350 U.S. 422, 76 S.Ct. 497, 100 L.Ed. 511 (1956).

The majority would have us eradicate the important Constitutional right involved here by failing to require the trial court to give the requested instruction. The majority states that the instruction is not necessary because Woodall did not contest any of the facts or aggravating circumstances surrounding the crimes. That may be so, but Appellant did contest the sought penalty of death during his penalty phase trial. He cross-examined the eleven witnesses presented by the Commonwealth and presented fourteen witnesses of his own who testified about Appellant's life and the effects his upbringing had on him. As noted in *Mitchell*, 526 U.S. at 327, 119 S.Ct. 1307, "it appears that in this case, as is often true in the criminal justice system, the defendant was less concerned with the proof of [his] guilt or innocence than with the severity of [his] punishment." For Appellant herein the stakes could not have been higher and his Fifth Amendment rights could not have been more important.

I also disagree with the trial judges' ruling that Appellant was not permitted to voir dire the jury about specific mitigating factors such as Appellant's mental retardation. While Appellant's IQ test results were not sufficiently low enough to render him ineligible for the death penalty, KRS 532.140, a defendant facing the death penalty must not only be allowed to present evidence of his low IQ but the jury must be able to consider and give effect to it as mitigating evidence. *Eddings v. Oklahoma*, 455 U.S. 104, 106, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *Morgan v. Illinois*, 504 U.S. 719, 722, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992).

Finally, as to the Batson challenge, I would have remanded this case to the trial court for a hearing at which time the Court should conduct an inquiry into the ultimate question of whether there was discriminatory intent in the exercise of the peremptory challenge. None was held and there was no ruling by the trial court on the legitimacy of the prosecution's explanation because the trial court apparently, and erroneously, believed that because Appellant was white, he had no ground to object to the exclusion of the sole black juror remaining in the venire. "[A] criminal defendant may object to race-based exclusions of jurors effected through peremptory challenges whether or not the defendant and the excluded juror share the same race." *Powers v. Ohio*, 499 U.S. 400, 402, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991).

KELLER, J., joins this dissent as to the mitigation evidence voir dire and *Batson* issues, but finds the trial court's failure to give a no adverse inference instruction, if erroneous, harmless because the defendant not only pled guilty, but admitted to the aggravating circumstances.