*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 12a0215p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

ROBERT KEITH WOODALL,
    *Petitioner-Appellee/Cross-Appellant,*

    *v.*

THOMAS L. SIMPSON, Warden,
    *Respondent-Appellant/Cross-Appellee.*

Nos. 09-5352/5406

Appeals from the United States District Court
for the Western District of Kentucky at Paducah.
No. 06-00216—Thomas B. Russell, District Judge.

Argued: November 29, 2011

Decided and Filed:  July 12, 2012

Before:  MARTIN, COOK, and GRIFFIN, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Susan Roncarti Lenz, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, for Appellant/Cross-Appellee.  Laurence E. Komp, Manchester, Missouri, for Appellee/Cross-Appellant.  **ON BRIEF:** Susan Roncarti Lenz, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, for Appellant/Cross-Appellee.  Laurence E. Komp, Manchester, Missouri, David H. Harshaw III, DEPARTMENT OF PUBLIC ADVOCACY, LaGrange, Kentucky for Appellee/Cross-Appellant.

    MARTIN, J., delivered the opinion of the court, in which GRIFFIN, J., joined.  COOK, J. (pp. 9–19), delivered a separate dissenting opinion.

_____

## OPINION

_____

    BOYCE F. MARTIN, JR., Circuit Judge.  Warden Thomas L. Simpson appeals from a district court judgment granting in part Robert Keith Woodall's petition for a writ

of habeas corpus filed under 28 U.S.C. § 2254. Woodall is a Kentucky prisoner under sentence of death. Woodall cross-appeals the part of the judgment denying his remaining claims. Woodall pled guilty to capital murder, capital kidnapping, and first-degree rape. After a penalty trial, the trial court adopted the recommendation of the jury and sentenced Woodall to death on the murder conviction and life imprisonment for the remaining convictions. Woodall unsuccessfully appealed his sentence to the Kentucky Supreme Court and then filed a writ of habeas corpus in federal district court. The district court granted Woodall's petition for a writ of habeas corpus because the trial court denied him his Fifth Amendment right against self-incrimination and made a constitutional error during jury selection. For the following reasons, the judgment of the district court is **AFFIRMED**.

I.

The facts of this case have been set forth by the Kentucky Supreme Court, *Woodall v. Commonwealth*, 63 S.W.3d 104, 114 (Ky. 2001), and need not be restated in detail. The victim was a sixteen-year-old female. On January 25, 1997, the night of the murder, she left her family home between 7:30 p.m. and 8:00 p.m., heading to a nearby convenience store. When she had not returned home several hours later, her family contacted the police. The victim's unclothed body was found floating in a lake, about one-half mile from the convenience store. Her throat had been slashed twice and her windpipe was totally severed; officials determined the actual cause of death to be drowning.

Woodall pled guilty to capital murder, capital kidnaping, and first-degree rape. At the penalty trial, Woodall cross-examined each of Kentucky's eleven witnesses and called fourteen of his own witnesses who testified about Woodall's life and upbringing. Woodall did not testify and requested that the trial judge instruct the jury that it should not draw any adverse inference from his decision not to testify. The trial judge concluded that Woodall was not entitled to the requested instruction, determining that, by entering a guilty plea, Woodall had waived his right to be free from self-incrimination. The jury recommended that Woodall be sentenced to death for the murder

of the victim. The jury recommended that Woodall be punished to two consecutive life sentences for the kidnaping and rape. The trial court adopted these recommendations.

On direct appeal, the Kentucky Supreme Court affirmed Woodall's convictions and sentences, with two justices dissenting. *Id.* at 134-35. Woodall filed a motion for relief from judgment and a motion to vacate his sentence. The trial court denied both motions and the Kentucky Supreme Court affirmed those decisions. *Woodall v. Commonwealth*, No. 2003-SC-000475-MR, 2005 WL 3131603 (Ky. Nov. 23, 2005); *Woodall v. Commonwealth*, No. 2004-SC-0931-MR, 2005 WL 2674989 (Ky. Oct. 20, 2005).

In 2006, Woodall filed his section 2254 petition in federal court. The district court granted habeas relief for two of Woodall's thirty claimed grounds for relief; the court denied Woodall's remaining claims as meritless. Specifically, the district court granted Woodall's petition for habeas on his claim that the trial court violated his Fifth Amendment right against self-incrimination by failing to instruct the jury to draw no adverse inference from Woodall's decision not to testify, despite Woodall's request for such an instruction. The district court also found that the trial court violated Woodall's Fifth, Eighth, and Fourteenth Amendment rights during jury selection when the trial court allowed Kentucky to use a peremptory challenge to strike an African-American member of the jury without holding a hearing pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986). The warden appeals both of these decisions. Woodall appeals the district court's denial of his claim that the trial court improperly instructed the jury that they had to find any mitigating circumstances unanimously, and the district court's denial of his motion for the appointment of a mental retardation expert. Because the failure to instruct the jury that it could not draw an adverse inference from Woodall's decision not to testify was a violation of Woodall's Fifth Amendment rights, and because we are in "grave doubt as to the harmlessness" of this violation's impact on the jury's decision to sentence Woodall to death, *see O'Neal v. McAninch*, 513 U.S. 432, 445 (1995), we affirm the district court's grant of the writ of habeas on this basis and do not reach the other questions presented in this appeal.

II.

When considering a petition for a writ of habeas corpus under the Antiterrorism and Effective Death Penalty Act of 1996, this Court may not grant the writ unless it finds that the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law," or (2) "based on an unreasonable determination of the facts in light of the evidence presented."  28 U.S.C. § 2254(d); *see also Ruelas v. Wolfenbarger*, 580 F.3d 403, 408 (6th Cir. 2009).  Under the "contrary to" clause, a federal habeas court may grant the writ "if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court on materially indistinguishable facts."  *Boykin v. Webb*, 541 F.3d 638, 642 (6th Cir. 2008) (citing *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000)).  Under the "unreasonable application" clause, "a federal habeas court may grant the writ if the state court identifies the correct legal principle from the Supreme Court's decisions but unreasonably applie[d that principle to] the petitioner's case."  *Id*.

The warden challenges the district court's grant of habeas corpus based on the district court's conclusion that the state courts unreasonably applied clearly established federal law.  Woodall's principal argument is that the state court violated his Fifth Amendment right against self-incrimination when it refused to give a requested jury instruction that the jurors draw no adverse inference from his decision not to testify.

The Fifth Amendment, made applicable to the states through the Fourteenth Amendment, "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt."  *Griffin v. California*, 380 U.S. 609, 615 (1965).  The Supreme Court has concluded that the Fifth Amendment requires a trial judge to give a "no adverse inference" instruction when requested by a defendant during the guilt phase of a trial.  *See Carter v. Kentucky*, 450 U.S. 288, 303 (1981) ("No judge can prevent jurors from speculating about why a defendant stands mute in the face of a criminal accusation, but a judge can, and must, if requested to do so, use the unique power of the jury instruction to reduce that speculation to a

minimum."). In *Estelle v. Smith*, the Supreme Court held that a defendant's entitlement to the Fifth Amendment's protection against self-incrimination extends from the guilt phase to the penalty phase of a bifurcated capital trial. 451 U.S. 454, 462-63 (1981) ("We can discern no basis to distinguish between the guilt and penalty phases of respondent's capital murder trial so far as the protection of the Fifth Amendment privilege is concerned."). More recently, in *Mitchell v. United States*, the Supreme Court held that the "rule against negative inferences at a criminal trial appl[ies] with equal force at sentencing," even where a defendant has pled guilty. 526 U.S. 314, 329 (1999); *id.* at 326 ("Where the sentence has not yet been imposed a defendant may have a legitimate fear of adverse consequences from further testimony.").

We are faced with the question of whether Woodall has a clearly established constitutional right to a requested "no adverse inference" instruction during the penalty phase of a capital trial where he declined to testify. "The rule against adverse inferences is a vital instrument for teaching that the question in a criminal case is not whether the defendant committed the acts of which he is accused. The question is whether the Government has carried its burden to prove its allegations while respecting the defendant's individual rights." *Id.* at 330. Woodall's Fifth Amendment rights survived his guilty plea, *id.* at 326, and he was entitled to receive a "no adverse inference" instruction once he requested it. *Cf. Finney v. Rothgerber*, 751 F.2d 858, 863-64 (6th Cir. 1985) (finding that the "due process clause requires a trial court, if requested, to instruct the jury during the enhancement portion of a bifurcated trial of one charged as a persistent felony offender that no adverse inference may be drawn from the defendant's failure to testify").

We agree with the district court that reading *Carter*, *Estelle*, and *Mitchell* together, the only reasonable conclusion is that the trial court violated Woodall's Fifth Amendment rights by refusing to give a requested "no adverse inference" instruction. The Kentucky Supreme Court's denial of this constitutional claim was an unreasonable application of *Carter*, *Estelle*, and *Mitchell*. *See Williams*, 529 U.S. at 407 ("[A] state-court decision [is] an unreasonable application of [the Supreme] Court's precedent if the

state court . . . unreasonably refuses to extend [a legal] principle to a new context where it should apply."); *Mason v. Mitchell*, 543 F.3d 772, 772 (6th Cir. 2008) ("Clearly established law . . . encompasses more than just bright-line rules laid down by the Supreme Court. It also clearly includes legal principles and standards enunciated in the Court's decisions." (alterations and internal quotation marks omitted)). The district court held that a capital defendant has a Fifth Amendment right to a "no adverse inference" instruction during the sentencing phase of a trial, even if guilt has already been established through a plea agreement. We agree. "Given the gravity of the decision to be made at the penalty phase, the State is not relieved of the obligation to observe fundamental constitutional guarantees." *Estelle*, 451 U.S. at 463. At stake in the penalty phase of a capital trial such as Woodall's is not only what specific punishment the defendant will receive, but whether he will be put to death. The due process clause requires that a trial court, if requested by the defendant, instruct the jury during the penalty phase of a capital trial that no adverse inference may be drawn from a defendant's decision not to testify.

The warden argues that any error resulting from the district court's failure to give a "no adverse inference" instruction was harmless because it did not have a substantial and injurious effect or influence on the sentence of this case. For purposes of federal habeas corpus review, a constitutional error that implicates trial procedures is considered harmless unless it had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (internal quotation marks omitted); *Doan v. Carter*, 548 F.3d 449, 459 (6th Cir. 2008); *see also Stewart v. Erwin*, 503 F.3d 488, 501 n.5 (6th Cir. 2007) (applying the harmless error standard to constitutional errors in sentencing). "Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Brecht*, 507 U.S. at 637. To determine the effect of an error, the court must determine "whether the [outcome that was] actually rendered in this trial was surely unattributable to that error." *Doan*, 548 F.3d at 459 (internal quotation marks omitted). The Supreme Court has observed that "it is arguable that a refusal to give [a 'no adverse inference'

instruction] can never be harmless." *Carter*, 450 U.S. at 304 (declining to reach the question because it was not then presented and had not been before the state court); *see also Lakeside v. Oregon*, 435 U.S. 333, 340 & n.10 (1978) (discussing the likelihood that a jury will draw an adverse inference from a defendant's decision not to testify). "The Supreme Court has emphasized . . . that when a habeas court is in grave doubt as to the harmlessness of an error that affects substantial rights, it should grant relief." *Erwin*, 503 F.3d at 501 (internal quotation marks omitted). "[G]rave doubt" means "that, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *O'Neal*, 513 U.S. at 435; *see also id.* at 437-38 ("[I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected.").

The warden argues that any error in the court's failure to instruct the jury was harmless because of the overwhelming evidence of Woodall's guilt presented during the penalty phase and the overwhelming evidence of the heinousness of the crimes, and because Woodall admitted the statutory aggravators necessary to impose the death penalty. If it were the case that a finding of the existence of statutory aggravators compels the imposition of the death penalty, then perhaps the trial court's error would have been "harmless." But the finding of the aggravating circumstances did not compel the jury to recommend a death sentence: the jury could have rejected the death penalty even if it found the existence of aggravating circumstances beyond a reasonable doubt. *See Skaggs v. Parker*, 235 F.3d 261, 271 (6th Cir. 2000) (describing the variety of mitigating circumstances that a jury can consider during a penalty phase under Kentucky law). Because we cannot know what led the jury to make the decision that it did, and because the jury may well have based its decision on Woodall's failure to testify, we cannot conclude that this is a case of "harmless error." *See Carter*, 450 U.S. at 304 (noting that it is "arguable" that refusing to give a "no adverse inference instruction" is "never" harmless); *Ullman v. United States*, 350 U.S. 422, 426 (1956) ("Too many, even those who should be better advised, view this privilege as a shelter for wrongdoers.

They too readily assume that those who invoke it are either guilty of crime or commit perjury in claiming the privilege."); *see also Bruno v. United States*, 308 U.S. 287, 294 (1939). Indeed, the trial court itself appears to have drawn an adverse inference from Woodall's decision not to testify: in denying the requested instruction, the trial court stated that it was "aware of no case law that precludes the jury from considering the defendant's lack of explanation of remorse or explanation of the crime or anything else once guilt has been adjudged in sentencing." The trial court's own inferences illustrate our concern. Given our grave doubt that the jury's recommendation was not influenced by adverse inferences drawn from Woodall's decision not to testify, we "cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *O'Neal*, 513 U.S. at 437 (internal quotation marks omitted). Under these circumstances, "it is impossible to conclude that the substantial rights were not affected." *Id.* at 437-38 (internal quotation marks omitted). Therefore, under *O'Neal*, we treat the error as harmful and grant Woodall's petition on this basis. *See Jensen v. Romanowski*, 590 F.3d 373, 381 (6th Cir. 2009) (applying *O'Neal* where the court could not "be certain that the error had 'no or small effect' on the jury's verdict" and had "'grave doubt' that the error was harmless"). Because the violation of Woodall's substantial rights requires issuance of the writ, we do not address—or pass judgment upon—the other claims at issue in this appeal.

III.

For the foregoing reasons, the judgment of the district court is **AFFIRMED**. We **REMAND** with instructions to conditionally grant the writ unless the State of Kentucky elects to initiate resentencing proceedings within 180 days of the district court's order.

————————

**DISSENT**

————————

COOK, Circuit Judge, dissenting.  In granting habeas relief, today's majority finds a prejudicial violation of clearly established federal law in the trial court's failure to provide a *Carter* instruction to the sentencing jury after the defendant pleaded guilty to the relevant criminal conduct.  Yet, the Kentucky Supreme Court carefully considered petitioner's Fifth Amendment claim in light of the same Supreme Court decisions—*Carter*, *Estelle*, and *Mitchell*—and rightly found that none addresses the circumstances presented here.  The majority disregards that analysis, finds a violation of clearly established law, and ultimately resolves the matter in favor of speculation, worrying that the jury *may* have punished petitioner for failing to testify.  This, despite a mountain of undisputed evidence that petitioner abducted, raped, maimed, and drowned a sixteen-year-old high school student.  The court's judgment defies AEDPA deference and the Supreme Court's harmless-error teachings.  I respectfully dissent.

I.

Petitioner argues that the Fifth Amendment required the trial court to give a *Carter* instruction to his sentencing jury—i.e., to instruct the sentencing jury to draw no adverse inference from his decision not to testify at the sentencing hearing.  Because the appeal arises on habeas review, it turns on whether the Kentucky Supreme Court "unreasonabl[y] appli[ed] . . . clearly established [f]ederal law, as determined by the Supreme Court of the United States," in rejecting petitioner's claim.  28 U.S.C. § 2254(d)(1).  The majority answers in the affirmative, citing three Supreme Court decisions: *Carter v. Kentucky*, 450 U.S. 288 (1981); *Estelle v. Smith*, 451 U.S. 454 (1981); and *Mitchell v. United States*, 526 U.S. 314 (1999).  The majority overlooks, however, the Kentucky Supreme Court's careful and correct distinguishing of those cases, both on their facts and the legal principles at stake.  Kentucky's highest court reasoned as follows:

Woodall argues that he was denied due process, his right not to testify and a reliable sentence determination when the trial judge refused to instruct the jury to draw no adverse inference from the decision of Woodall not to testify during the penalty trial. Woodall pled guilty to all of the charged crimes as well as the aggravating circumstances. The no adverse inference instruction is used to protect a nontestifying defendant from seeming to be guilty to the jury because of a decision not to testify. That is not the situation presented here. The instruction contemplated by *Carter v. Kentucky*, 450 U.S. 288, 101 S. Ct. 1112, 67 L. Ed. 2d 241 (1981), could not have changed the outcome of a guilty determination that the defendant acknowledged by his admission of guilt. There was no reason or need for the jury to make any additional inferences of guilt.

There is no error in this respect. Any possible error would be nonprejudicial because the defendant admitted the crimes and the evidence of guilt is overwhelming. Woodall claims that *Estelle v. Smith*, 451 U.S. 454, 101 S. Ct. 1866, 68 L. Ed. 2d 359 (1981), extended Fifth Amendment protection and thus the *Carter*, *supra*, rule to the penalty phase of a trial. *Estelle*, *supra*, is not a jury instruction case, unlike *Carter*. *Estelle* does not cite to *Carter* or indicate that *Carter* has been extended. The factual situation in *Estelle* is different from that presented in this case because it involved the use of an out-of-court statement the defendant made to a government expert. The statement in that case was in regard to a psychological examination by the government prosecutors which was used against the defendant without warning in the penalty trial. Neither *Carter* nor *Estelle* involved a guilty plea. Here, Woodall admitted guilt to all charges and did not contest the facts. He was not compelled to testify so there were no words that could be used against him so as to implicate the Fifth Amendment privilege as in *Estelle*.

Woodall contends that *Mitchell v. United States*, 526 U.S. 314, 119 S. Ct. 1307, 143 L. Ed. 2d 424 (1999), permits a guilty plea which does not waive the privilege against self-incrimination at the sentencing phase. *Mitchell*, *supra*, does not apply here. In *Mitchell*, the defendant pled guilty to federal charges of conspiring to distribute five or more kilograms of cocaine and of distributing cocaine within 1000 feet of a school or playground. She reserved the right to contest the amount of the cocaine at the penalty phase. The amount of the cocaine would determine the range of penalties. She only admitted that she had done "some of" the conduct charged. She did not testify. Three other codefendants did testify as to the amount of cocaine she had sold. Ultimately, the U.S. Supreme Court ruled that it would not permit a negative inference to be drawn about her guilt with regard to the factual determination respecting the circumstances and details of the crime. Here, Woodall did not contest any of the facts or aggravating circumstances surrounding the crimes.

*Woodall v. Commonwealth*, 63 S.W.3d 104, 115 (Ky. 2001), *cert. denied*, 123 S. Ct. 145 (2002).  Only one Justice dissented from this portion of the court's judgment. *See id.* at 134 (Stumbo, J., dissenting), 135 (Keller, J., dissenting on other grounds) (deeming any error in this regard harmless,  "because the defendant not only pled guilty, but admitted to the aggravating circumstances").

Because the Kentucky Supreme Court applied the correct legal standards, and the facts of this case differ materially from the circumstances of *Carter*, *Estelle*, and *Mitchell*, AEDPA strictly limits our review to whether the Kentucky Supreme Court *unreasonably* applied rules *clearly established* by those cases.  28 U.S.C. § 2254(d)(1). "[C]learly established," in this context, confines our inquiry to "the holdings, as opposed to the dicta, of [U.S. Supreme Court] decisions as of the time of the relevant state-court decision."  *Williams v. Taylor*, 529 U.S. 362, 412 (2000).  And  "[u]nreasonable application" means "objectively unreasonable," not simply incorrect.  *Lockyer v. Andrade*, 538 U.S. 63, 75–76 (2003) (explaining that AEDPA deference requires more than clear error).  Under this standard, a habeas petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 131 S. Ct. 770, 786–87 (2011).  In other words, we may not grant habeas relief "so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  *Id.* at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)); *accord Gagne v. Booker*, 680 F.3d 493, 512–14 (6th Cir. 2012) (en banc plurality opinion).

AEDPA deference requires careful inspection of the distinctions highlighted by the Kentucky Supreme Court.  "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Harrington*, 131 S. Ct. at 786 (quoting *Yarborough*, 541 U.S. at 664); *see also Moses v. Payne*, 555 F.3d 742, 754 (9th Cir. 2009) ("[W]hen a Supreme Court decision does not 'squarely address[ ] the issue in th[e] case' or establish a legal principle that 'clearly

extend[s]' to a new context to the extent required by the Supreme Court in these recent decisions, [*Wright v. Van Patten*, 552 U.S. 120, 125 (2008),] it cannot be said, under AEDPA, there is 'clearly established' Supreme Court precedent addressing the issue before us, and so we must defer to the state court's decision."). The majority does not suggest that any of its Fifth Amendment cases alone clearly established the trial court's obligation to give the no-adverse-inference instruction under the circumstances of this case. Rather, it reads *Carter*, *Estelle*, and *Mitchell* as protecting a defendant's Fifth Amendment privilege at all stages of criminal proceedings, regardless of whether the defendant disputes any of the incriminating evidence.

Only *Carter* addresses the need for a prophylactic jury instruction to protect the Fifth Amendment privilege against self-incrimination. Noting the tendency of juries to infer guilt from a defendant's silence, *Carter* held that trial courts must provide a no-adverse-inference instruction during the guilt phase of a criminal trial upon request. 450 U.S. at 303. Yet, as the majority appears to recognize, *Carter* did not consider a defendant's entitlement to such an instruction at post-guilt stages of criminal proceedings or the effect of a defendant's guilty plea on that right—two variations relevant to this appeal. *See id.* at 289–90, 300–05.

*Estelle* and *Mitchell* speak more directly to these issues, generally recognizing that the Fifth Amendment privilege extends to the sentencing phase of criminal trials and that a generic guilty plea does not waive this right. But importantly, neither case extended the *Carter* remedy—a right to a no-adverse-inference instruction—to those specific circumstances. *Estelle* involved a state's surprise use of defendant's pre-trial statements to establish a necessary aggravating factor (future dangerousness) for capital punishment. 451 U.S. at 462–63. The defendant made the statements at a court-ordered, pre-trial psychiatric evaluation without the benefit of *Miranda* warnings. The Fifth Amendment violation thus involved both the coercive nature of the interrogation procedure *and* the state's use of the defendant's unwitting pre-trial statements to establish a necessary penalty factor against him. *Id.* at 467–69 (vacating the death sentence). Similarly, *Mitchell* found a Fifth Amendment violation where the sentencing

judge admitted to drawing an adverse inference regarding a disputed aggravating factor—the amount of drugs involved—from the defendant's failure to rebut the government's sentencing-hearing witnesses. Although the defendant previously pleaded guilty to a drug-conspiracy crime, she disputed the government's drug-quantity position, which carried a heavier penalty. Because her guilty plea did not eliminate the possibility of additional punishment, the *Mitchell* Court found that the Fifth Amendment precluded the trial court from drawing an adverse inference from her silence. 526 U.S at 330.

Admittedly, *Estelle* and *Mitchell* discuss the Fifth Amendment privilege in expansive terms. From *Estelle*:

> The Fifth Amendment privilege is as broad as the mischief against which it seeks to guard, and the privilege is fulfilled only when a criminal defendant is guaranteed the right to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence.

451 U.S. at 467–68 (internal citations and quotation marks omitted). *Mitchell* goes further, with the following statements:

> Treating a guilty plea as a waiver of the privilege at sentencing would be a grave encroachment on the rights of defendants. . . .
>
> . . . .
>
> Where the sentence has not yet been imposed a defendant may have a legitimate fear of adverse consequences from further testimony. . . .
>
> . . . .
>
> The concerns which mandate the rule against negative inferences at a criminal trial apply with equal force at sentencing. Without question, the stakes are high: Here, the inference drawn by the District Court from petitioner's silence may have resulted in decades of added imprisonment. The Government often has a motive to demand a severe sentence, so the central purpose of the privilege—to protect a defendant from being the unwilling instrument of his or her own condemnation—remains of vital importance.
>
> . . . .

. . . The rule against adverse inferences is a vital instrument for teaching that the question in a criminal case is not whether the defendant committed the acts of which he is accused. The question is whether the Government has carried its burden to prove its allegations while respecting the defendant's individual rights. The Government retains the burden of proving facts relevant to the crime at the sentencing phase and cannot enlist the defendant in this process at the expense of the self-incrimination privilege. . . .

526 U.S. at 324, 326, 329, 330. But these statements must be read in context. *Estelle* involved the *actual use* of a defendant's coerced statements against him. Both *Estelle* and *Mitchell* presented an adverse inference that effectively shifted the government's burden of proving a disputed aggravating circumstance to the defendant. Accordingly, both cases involved government or court actions that penalized the defendant—by exposing the defendant to greater punishment—for exercising the Fifth Amendment privilege.

This case did not. The state did not coerce petitioner to make any statement. Nor did it seek an adverse inference or oppose petitioner's request for a *Carter* instruction during the sentencing hearing. And, importantly, the state did not shift its burden of proving a disputed aggravating factor to petitioner. The state's current opposition to habeas relief reflects the unique circumstances of Woodall's sentencing hearing—namely, that his guilty plea admitted both the relevant criminal conduct and the required aggravating circumstances for the death penalty (rape and kidnapping), and that his sentencing position did not dispute any of these facts. Now that Woodall has been sentenced, the state has a legitimate interest in opposing Woodall's stance on the *Carter* instruction. In the absence of disputed facts, Woodall's silence would demonstrate only a lack of remorse; a *Carter* instruction would restrict the jury from considering that relevant fact. Considering that *Mitchell* expressly exempted lack-of-remorse and acceptance-of-responsibility findings from its holding, 526 U.S. at 330, the state has good reason to believe that the Fifth Amendment did not require the *Carter* instruction here.

In sum, the punitive element so critical in *Estelle* and *Mitchell*—the state's use of the defendant's silence to impose greater punishment—is wholly absent. *Cf. Lakeside v. Oregon*, 435 U.S. 333, 344 (1978) (explaining that "the government may not add

unnecessarily to the risk taken by a defendant who stands mute"). And none of the Fifth Amendment cases cited by the majority clearly establishes the right to a *Carter* instruction in these circumstances.[1] The majority's position extends the rules of those cases, and fairminded jurists may differ in the application of those rules to the facts in this case.

Six Justices of the Kentucky Supreme Court, in fact, did so. The majority improperly dismisses their judgment (as well as the Report and Recommendation of the federal magistrate judge) without so much as a nod to the standard that the judgment be beyond the purview of fairminded jurists. This stance not only flouts the AEDPA standard, but also undermines the animating purposes of AEDPA deference: comity, finality, and federalism. *See, e.g.*, *Woodford v. Garceau*, 538 U.S. 202, 206 (2003).

Reasonable though the majority's Fifth Amendment analysis may be, AEDPA deference precludes us from substituting our reasonable judgment for that of the state's highest court. In my view, the Kentucky Supreme Court reasonably applied federal law.

## II.

The majority compounds its error by engaging in a form of *possible*-harm review that verges on a presumption of prejudice. This leniency appears both in its emphasis on dicta opining about the likelihood that juries draw adverse inferences, and in its ultimate finding of a "very real risk" of prejudice. Alas, the correct harmless-error standard does not permit such speculation, and neither does the undisputed evidence of this heinous crime.

As foreshadowing of the harmless-error review to come, the court twice emphasizes a statement in *Carter* that "it is arguable that a refusal to give an instruction

---

[1]The majority's passing mention of *Finney v. Rothgerber*, 751 F.2d 858, 864 (6th Cir. 1985) does not fit this bill for a number of reasons. First, *Finney* is not a Supreme Court decision and therefore not "clearly established" federal law under AEDPA. *See* 28 U.S.C. § 2254(d)(1); *Williams*, 529 U.S. at 412. Second, the decision predates the enactment of AEDPA, and thus did not assess the state-court judgments under its deferential "unreasonable application of . . . clearly established [f]ederal law" standard. And third, the court found the Fifth Amendment violation harmless under the demanding, pre-*Brecht*, *Chapman* rule, noting that undisputed evidence satisfied "all of the statutory requirements for guilt as a persistent felony offender." *Finney*, 751 F.2d at 864–65.

similar to the one that was requested here can never be harmless." 450 U.S. at 304. Yet because *Carter* declined to decide the issue, our decision in *Finney v. Rothgerber* requires us to review for harmless error. 751 F.2d 858, 864 (6th Cir. 1985) (reviewing for harmless error the state court's failure to give a *Carter* instruction during the persistent-felony-offender penalty phase of a criminal trial); *see also Chapman v. California*, 386 U.S. 18, 22 (1967) (subjecting most constitutional claims to harmless-error review, including a prosecutor's comment about the defendant's exercise of the Fifth Amendment privilege); *Hunter v. Clark*, 934 F.2d 856, 859–60 (7th Cir. 1991) (en banc) (justifying application of harmless-error review to a *Carter* claim by noting the more severe infraction on the Fifth Amendment privilege resolved by harmless-error review in *Chapman*); *Richardson v. Lucas*, 741 F.2d 753, 755 (5th Cir. 1984) (same).[2] The majority ostensibly concedes this point.

It then begins its harmless-error review on the right track, citing *Brecht v. Abrahamson*, 507 U.S. 619 (1993) for the standard applicable to habeas cases. From *Brecht*, the majority correctly defines harmful error as one "ha[ving] substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 637 (citation omitted). But then the majority offers conflicting statements from *Brecht* and *Doan v. Carter*, 548 F.3d 449, 459 (6th Cir. 2008), first saying that the petitioner must establish "actual prejudice," and then suggesting that harmless error refers only to outcomes "surely unattributable to [the alleged] error." The majority's conclusion—that the

---

[2]*Bruno v. United States*, cited by the majority, does not counsel otherwise, both because it involved a statutory privilege and statutory harmless-error review, and because it predates *Chapman*'s mandate of harmless-error review for most constitutional errors. *Bruno v. United States*, 308 U.S. 287, 293–94 (1939) (construing federal statute guaranteeing a defendant's right to testify or remain silent to require a preemptive, no-adverse-inference instruction, and finding harmful the denial of that right).

During oral argument, petitioner's counsel briefly suggested that the denial of a *Carter* instruction here constituted a "structural" error exempt from harmless-error review. *See generally Brecht v. Abrahamson*, 507 U.S. 619, 629 (1993) (differentiating between "trial error[s]" subject to harmless-error review and "structural defects" presumed prejudicial). But counsel did not make that argument in petitioner's appellate brief (*see* Appellee Br. at 32–37), and therefore offers no explanation for the harmless-error review in *Chapman*—a case involving a more severe Fifth Amendment violation—or our decision in *Finney*. More recent articulations of what constitutes "structural error" do not disturb these precedents. *See, e.g.*, *Neder v. United States*, 527 U.S. 1, 8 (1999) (reiterating that "most constitutional errors can be harmless" and describing "structural errors" as "defect[s] affecting the framework within which the trial proceeds" that "deprive defendants of basic protections" so as to undermine the reliability of the trial's "determination of guilt or innocence" (internal citations and quotation marks omitted)).

absence of a *Carter* instruction *may* have influenced the jury—reveals that it tips the scales in favor of the habeas petitioner.

As the majority appears to acknowledge, *O'Neal v. McAninch* clarified the habeas harmless-error standard announced in *Brecht*. *O'Neal v. McAninch*, 513 U.S. 432 (1995); *see also Fry v. Pliler*, 551 U.S. 112, 121 n.3 (2007) (plurality).  *O'Neal* explained that *Brecht*'s "actual prejudice" language did not burden the habeas petitioner to produce evidence of prejudice.  513 U.S. at 436–39.  It did, however, acknowledge the more lenient harmless-error standard applicable to habeas cases, as compared to direct appeals.  *O'Neal*, 513 U.S. at 438 (differentiating the *Brecht* standard from the "stricter" *Chapman* standard); *see also Fry*, 551 U.S. at 119–20 (explaining that the *Brecht*/*Chapman* harmless-error dichotomy survived AEDPA's enactment).  After *O'Neal*, "grave doubt" became the harmfulness threshold for habeas harmless-error review.  *O'Neal*, 513 U.S. at 435.  "Grave doubt" refers to situations where, after reviewing the record, "the matter is so evenly balanced that [the judge] feels himself in virtual equipoise as to the harmlessness of the error."  *Id.*; *see also id.* at 436–37 ("[W]e think it conceptually clearer for the judge to ask directly, 'Do I, the judge, think that the error substantially influenced the jury's decision?' than for the judge to try to put the same question in terms of proof burdens (*e.g.*, 'Do I believe the party has borne its burden of showing . . .?').").

Our cases follow this guidance.  *E.g.*, *Ferensic v. Birkett*, 501 F.3d 469, 480–81 (6th Cir. 2007); *Caldwell v. Bell*, 288 F.3d 838, 842–43 (6th Cir. 2002).  *Doan* did not, though it still found harmless error under a stricter standard.  *Doan*, 548 F.3d at 459 (neglecting to cite *O'Neal*, and instead applying the "surely unattributable" standard from *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993), a case applying *Chapman* harmless-error review on direct appeal).  We must follow the "grave doubt" method advanced in *O'Neal*.

With this standard, review of the record here leaves little room for doubt, let alone grave doubt.  The state presented eleven witnesses and the defense fourteen.  The sentencing jury heard undisputed evidence of the abduction, rape, maiming, and

drowning of the victim; petitioner admitted as much by virtue of his guilty plea. Undisputed forensic evidence corroborated these facts. On the issue of remorse, the jury heard independent testimony from petitioner's mother that, shortly after the murder, petitioner came to her house, sat in a recliner, and watched television as if nothing had happened. Petitioner even benefitted from a jury instruction (No. 1) he did not deserve, which told the jurors to presume his *innocence* of the aggravating factors he admitted, unless the state presented proof beyond a reasonable doubt.

Conversely, the jury heard *nothing* about petitioner's silence from the state or from the trial court, and we have no way of knowing whether it even noticed. Nevertheless, the majority assumes "a very real risk" that his silence "had substantial and injurious effect or influence" on the verdict. Faced with this overwhelming and undisputed evidence, why would it?

The majority faults the trial judge for drawing an adverse inference (the *Mitchell* mistake), but the judge did nothing more than issue a legal ruling, stating that he *knew of no authority* precluding a sentencing jury from considering a defendant's lack of remorse. And even if he did draw an adverse inference, the jury who made the sentencing recommendation did not hear this statement. Petitioner correctly notes that, under Kentucky law, the sentencing jury retains the discretion to recommend a life sentence, despite the presence of aggravating factors. Yet, that fact does not make it any more likely that Woodall's silence substantially affected the jury's verdict.

Notably absent from the majority's harmless-error analysis is any discussion of *Finney*, a case the majority cites as supporting its finding of a constitutional violation. *Finney* involved somewhat similar circumstances, in that the trial court refused to give a *Carter* instruction to the sentencing jury in a post-guilt, persistent-felony-offender hearing. There, despite finding a Fifth Amendment violation, we held that "[t]he overwhelming evidence of guilt as a persistent felony offender makes failure to give the requested instruction harmless beyond a reasonable doubt as to that issue." *Finney*, 751 F.2d at 864–65 (noting that undisputed evidence established the statutory prerequisites for the sentencing enhancement). We did so, despite applying the stricter,

pre-*Brecht, Chapman* standard, which required harmlessness "beyond a reasonable doubt." One can only wonder how the circumstances deemed harmless *beyond a reasonable doubt* in *Finney* somehow become harmful under the more lenient "substantial and injurious effect" standard of *Brecht*, or even leave "grave doubt" as to harmfulness under *O'Neal*.

"There is, of course, a strong policy in favor of accurate determination of the appropriate sentence in a capital case, but there is an equally strong policy against retrials years after the first trial where the claimed error amounts to no more than speculation." *Boyde v. California*, 494 U.S. 370, 380 (1990). The state expended significant resources to ensure a fair sentencing hearing for Woodall. The majority brushes that aside on supposition. Pure conjecture does not establish grave doubt. I harbor none and would deny the writ.